**Robert Charles COMER, Petitioner,**

v.

**Terry STEWART, et al., Respondents.**

**No. CV–94–1469–PHX–ROS.**

United States District Court,
D. Arizona.

Oct. 16, 2002.

---

Michael D. Kimerer, Holly R. Gieszl, Kimerer & Derrick PC, Phoenix, AZ, Peter James Eckerstrom, Denise I. Young, Julie Singleton Hall, Tucson, AZ, for Petitioner.

Michael L. Brodsky, Office of the Attorney General, John Presley Todd, Phoenix, AZ, for Respondents.

## AMENDED OPINION

### (Death Penalty)

SILVER, District Judge.

The Court issued an Order on June 20, 2002, announcing its decision and finding that Petitioner Robert Comer was competent to dismiss habeas counsel and to forego further legal review, and that he made these decisions voluntarily. The Court issued an opinion setting forth its findings of fact and conclusions of law on July 29, 2002. This amended opinion is issued to correct typographical and grammatical errors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Petitioner Robert Charles Comer ("Mr.Comer") is an Arizona inmate sentenced to death for murder. Following the denial by this Court of his petition for capital habeas relief, he filed an appeal with the Ninth Circuit Court of Appeals. Respondents filed a motion to dismiss the appeal based on *pro se* letters written by Petitioner and mailed by him to their counsel reflecting his desire to terminate appointed habeas counsel's ("habeas counsel") representation, forego further legal review and proceed to execution. Petitioner also sent a *pro se* motion to dismiss his appeal to the Ninth Circuit. Habeas counsel objected to the motions and asked the Ninth Circuit to establish a procedure to determine whether Petitioner was competent to terminate representation and waive his appeal and whether his decisions were rendered involuntary because of his conditions of confinement. The Ninth Circuit granted habeas counsel's request, suspended ruling on Petitioner's motions pending remand to this Court for an evidentiary hearing regarding Petitioner's competency and the voluntariness of his decisions.

An evidentiary hearing was conducted on March 26–28, 2002. Before discussing the evidence presented at the hearing and the legal basis for this Court's decisions, the Court summarizes the circumstances involved in the filing of this action, the appointment of counsel, the denial of habeas relief and appeal and pertinent post-remand events.

## BACKGROUND

### I. Procedural History

On July 19, 1994, Mr. Comer filed a motion for stay of execution with a petition

for habeas relief and a motion for appointment of counsel, personally signed by him. (Dkt. 1.)[1] The same day, a stay of execution was entered and John R. Hannah, then with the Federal Public Defender ("FPD"), and Peter Eckerstrom were appointed as counsel for Mr. Comer. On February 28, 1997, Denise I. Young of the FPD was substituted in place of Hannah. (Dkt. 105.) Mr. Comer filed an amended petition for habeas relief. (Dkt. 28.) The Court determined that certain of the claims in the amended petition were procedurally barred and that Mr. Comer was not entitled to relief on the merits of the remaining claims. (Dkts. 86 and 111.) Mr. Comer was granted a certificate of probable cause on March 3, 1998. (Dkt. 119.)

On June 6, 2000, the Ninth Circuit remanded this matter to this Court with instructions to hold an evidentiary hearing to determine whether Mr. Comer was competent to terminate representation by counsel and forego further legal review, and whether his conditions of confinement rendered those decisions involuntary. At that time, Mr. Comer had been an inmate in the custody of the Arizona Department of Corrections ("ADOC") for twelve years. Mr. Comer was housed in Cellblock 6 ("CB6") of the Arizona State Prison in Florence, Arizona, for several months in 1988. Between 1989 and 1996, Mr. Comer was housed in Special Management Unit I ("SMU I") in the Eyman Complex of the Arizona State Prison in Florence, Arizona. Since 1996, Mr. Comer has been housed in SMU II, also in the Eyman Complex.

On June 30, 2000, Julie Hall, formerly with the FPD, was substituted for the FPD as habeas co-counsel and filed a notice of appearance. (Dkt. 122.)

On or about July 18, 2000, Mr. Comer mailed *pro se* a letter to Assistant Arizona Attorney General Jon Anderson, who then represented Respondents.[2] (Ex. A to Dkt. 123.) In the letter, Mr. Comer thanked Anderson for his efforts seeking dismissal of Mr. Comer's appeal and suggested that Anderson represent him in his efforts to dismiss his appeal. In those letters Mr. Comer claimed he did not want to meet with his lawyers; however, he acknowledged that his daughter had at some point asked him to meet with lawyers, which he did, and he acknowledged that he did "sign a few papers ... so Pete [Eckerstrom] can get paid." He further stated that he had only learned "a month ago or so" that his automatic direct appeal had ended some time before and that he had believed "those lawyers" with whom he had met were involved in the automatic direct appeal of his conviction. (Ex. A at 3 to Dkt. 123.) Mr. Comer accused habeas counsel of having disseminated lies about him by calling him "delusional" and "mentally damaged." (*Id.*) Mr. Comer provided Anderson with the names of corrections officers he thought could or would verify his competence. (*Id.*)

On July 20, 2000, Respondents filed a motion for determination of counsel for Mr. Comer based in part on one of Mr. Comer's letters. (Dkt. 123.) On July 25, 2000, Mr. Comer filed *pro se* motions to attend any and all proceedings, and to either substitute new counsel or to allow him to represent himself. (Dkts. 124 and 126.)

A status hearing was held on August 25, 2000, on the motion for determination of counsel.[3] Mr. Comer appeared by video-conference from a secure location in Flor-

---

1. "Dkt." refers to documents filed in this particular action.

2. In January 2001, John Todd was substituted as counsel for Respondents. (Dkt. 152.)

3. On August 11, 2000, habeas counsel filed a motion to disqualify the Office of the Arizona Attorney General. (Dkt. 130.) Habeas counsel argued the Ninth Circuit had placed the Arizona Attorney General's Office on notice that Mr. Comer could not be presumed com-

ence, Arizona. (Dkt. 131.) After hearing oral argument on the motion to disqualify, the Court denied the motion finding no basis to disqualify the Attorney General's Office based on its asserted interference with the attorney-client relationship, nor did the Court find a basis for an alleged violation of Mr. Comer's Fifth and Sixth Amendment rights. (Dkts. 136 & 138.)

The Court also considered whether the attorney-client relationship between Mr. Comer and habeas counsel had been irreconcilably broken. Habeas counsel explained that while the attorney-client relationship was strained because habeas counsel sought a determination that Mr. Comer was incompetent to abandon his appeal and dismiss them as counsel, they remained committed to appropriately representing what they believed to be Mr. Comer's "rational interests" pending a determination of Mr. Comer's competency and the voluntariness issue. (R.T. 8/25/00 at 50–51.)[4] During a sealed portion of the hearing with only habeas counsel and Mr. Comer, Mr. Comer strenuously expressed his unwillingness to communicate or cooperate with habeas counsel if they questioned his decision to abandon his appeal, and his competence to do so. Habeas counsel opined that Mr. Comer was unlikely to cooperate with any attorney who did not accede to his decision.

On September 18, 2000, the Court granted Respondents' motion, but ordered habeas counsel to continue to represent Mr. Comer in connection with his habeas claims pending a determination of competency and voluntariness.[5] (Dkt. 138.) Concomitantly, and in accordance with the procedure embraced by the Ninth Circuit in *Mason v. Vasquez*, 5 F.3d 1220, 1223 (9th Cir.1993), the Court appointed Michael Kimerer, Esq., a certified Arizona State Bar criminal specialist, whose firm is A–V rated, and who enjoys an excellent reputation in the legal community as special counsel, to represent Mr. Comer concerning his expressed decisions to end his appeals and proceed to execution.[6] (*Id.*)

---

petent "to waive important procedural rights in the absence of a competency hearing" but that Anderson had nevertheless opened, read and cited the July 18 letter in support of Respondents' motion to determine counsel. Habeas counsel argued that opening, reading and citing the July 18 letter to support potential substitution of habeas counsel interfered with Mr. Comer's attorney-client privilege when Mr. Comer was not presumed competent to waive the privilege and when a decision to waive the privilege could not be presumed voluntary.

**4.** "R.T." refers to the reporter's transcript of a hearing. "Dep. R.T." refers to the reporter's transcript of Dr. Kupers's rebuttal testimony on April 2, 2002.

**5.** This Court is aware of the ethical predicament facing all habeas counsel in these circumstances. The Court is also persuaded, however, that throughout the proceedings in this matter habeas counsel fully understood their ethical obligations and performed their responsibilities ethically. They aggressively prepared and presented their position, while remaining sensitive to the reality that it was contrary to the stated views of Mr. Comer and would inevitably create tension in their relationship with him. *See* Ross E. Eisenberg, *The Lawyer's Role When the Defendant Seeks Death*, 14 CAP. DEF. J. 55 (Fall 2001). The clear potential for conflicts in these situations between ethical rules requires habeas counsel to find an exquisite balance. Unfortunately there is little guidance in the rules or comments for lawyers who struggle to find that balance in these difficult circumstances.

**6.** Some delay occurred following Mr. Kimerer's appointment while Mr. Kimerer attempted to, and successfully did, establish an attorney-client relationship with Mr. Comer, who previously demonstrated his aversion to contact with any counsel and who at the outset resisted contact with special counsel. (*See e.g.,* R.T. 3/28/02 at 669.) Mr. Kimerer was assisted by Ms. Holly Gieszl who enjoys a very good reputation within the legal community and the Arizona District Court. The Court has been made aware throughout these proceedings of the palpable strain on Mr. Kimer-

The Court instructed Mr. Kimerer ("Special Counsel") to first assess whether he believed Mr. Comer intended to waive his appeal and, if he did, to continually reassess Mr. Comer's decision. If at any time Mr. Comer wavered in his decision, or if Mr. Kimerer determined that Mr. Comer was not competent or his decision was not voluntary, Mr. Kimerer was to immediately inform the Court.

On November 3, 2000, the Court ordered the Director of ADOC, Terry Stewart, to surrender custody of Mr. Comer to the United States Marshal ("USM") for transport to the United States Medical Facility in Springfield, Missouri, for a complete psychiatric/psychological evaluation of his mental competence.[7] (Dkt. 140.) On December 8, 2000, the USM filed a motion to vacate the order to transport Mr. Comer to Springfield arguing that the Court lacked authority to compel it as a non-custodian to bear the expense of producing and transporting a state prisoner-witness for federal court proceedings under the All Writs Act, 28 U.S.C. § 1651. (Dkt. 145 at 1.) The Court denied the motion, but ordered Respondents to reimburse the USM for the costs of transporting Mr. Comer to Springfield. (Dkt. 146.) On January 31, 2001, Respondents filed a motion to stay or vacate portions of the November 3 Order, arguing that transporting Mr. Comer to and from Springfield posed an extreme security risk and that the cost of such transport, including appropriate security measures, would impose an undue hardship on Respondents. (Dkt. 151 at 1–2.) The risks posed by transportation allegedly would require "a USM Special Unit Squad . . . to be brought to Arizona, and an aircraft, presently located in Louisiana, [would] need to be put into service solely for the purpose." (*Id.*) Respondents reported that the USM estimated the costs associated with such transport at between $30,000 and $50,000 for aircraft, fuel, and personnel. (*Id.*) In addition, Respondents pointed to Mr. Comer's crimes of conviction and the discipline record he had amassed, which ADOC believed warranted characterizing him as the most dangerous prisoner in its custody; his disciplinary record included a special expertise or proclivity for making and concealing weapons and committing numerous assaults. (*Id.*) Respondents also argued that Mr. Comer would be able to make weapons while out of ADOC custody that he might attempt to smuggle into ADOC upon his return. (*Id.*) Respondents also pointed out that Mr. Comer had previously escaped from prison in California. (*Id.*) Habeas and special counsel also opposed transporting Mr. Comer to Springfield because of the extremely uncomfortable security procedures necessary to ensure his safe transport. (Dkts. 160 & 161.) Expedited briefing of the motion to stay/vacate was ordered. (Dkt. 153.)

Following argument on February 7, 2001, the Court granted the motion to vacate the transport order because of the extreme security risk posed by transport, the associated costs to ensure security, and the likelihood that a second evaluation would be required at ADOC to assess the voluntariness issue.

## II. Court Appointed Expert

The Court suggested that a neutral evaluator be appointed and ordered the parties

---

er and Ms. Gieszl in deciding whether to undertake to represent Mr. Comer, because of their opposition to the death penalty, and in representing him, because of his general mistrust of all attorneys and his frustration with the proceedings which he viewed as unnecessary.

7. Habeas and special counsel and Respondents were ordered to confer and submit a joint status report which was submitted on October 19, 2000. (Dkt. 139.)

to confer and suggest candidates. (Dkts. 158 & 162.) On February 9, 2001, the Court provided the parties with the curriculum vitae of Dr. Sally Johnson, Associate Warden Medical/Chief Psychiatrist of the Health Services Division of the Federal Correctional Complex at Butner, North Carolina for their consideration.[8] (Dkt. 162.) Respondents agreed to the appointment of Dr. Johnson. (Dkt. 164.) Habeas and special counsel had proposed alternative experts, but special counsel subsequently agreed to the appointment of Dr. Johnson. (Dkts. 163, 165 & 170; R.T. 3/8/01 at 3–4.) Dr. Johnson was appointed as an expert for the Court and habeas counsel reserved the right to seek the appointment of their own experts following the issuance of Dr. Johnson's report.. (Dkt. 174.)

On September 27, 2001, Dr. Johnson submitted her written evaluation concluding that Mr. Comer was competent to waive his appeal and that his decision to do so had not been rendered involuntary by his conditions of confinement. (Dkt. 282.) There were a surfeit of diversions that impeded the completion of Dr. Johnson's report and ultimately the holding of the competency hearing, two of which are discussed below.

### A. Conduct of Mr. Comer Warranting Discipline and the Media Event

Following Dr. Johnson's appointment, she and special counsel sought authorization for contact visits with Mr. Comer to facilitate and expedite completion of their respective tasks. On March 14, 2001, the Court entered a stipulated order lodged by Respondents granting the request. (Dkt. 180; R.T. 3/14/01 at 5–9.) Thereafter, several contact visits with Mr. Comer occurred without incident. On April 30, 2001, with the knowledge of, and without objection from Respondents, special counsel asked, and received, an order permitting them to forego wearing protective gear ordinarily required of anyone within physical proximity of a death row inmate. (Dkt. 197; R.T. 4/30/01 at 31–32.)

On May 4, 2001, correctional staff discovered a piece of metal had been cut from the desk in Mr. Comer's cell. A portion of the missing metal, sharpened into a blade, was reportedly recovered from the cell of an inmate adjacent to Mr. Comer's cell. A lighter flint, which ADOC believed Mr. Comer used to cut the metal from his desk to manufacture the shank, was reportedly found concealed in a wall of Mr. Comer's cell. The remainder of the metal cut from the desk was never found despite repeated searches of Mr. Comer's cell and the pod in which Mr. Comer was housed, as well as medical examinations of Mr. Comer and other inmates. Additionally, Mr. Comer made threatening statements to correctional officers. The Court was not notified of these events nor did Respondents seek modification of the stipulated-to contact visit order for Dr. Johnson and special counsel.

Instead, and without satisfactory explanation, Respondents contacted a local television station about airing a story concerning the risks posed by death row inmates generally, and Mr. Comer in particular.[9] On or about May 14 and 15, 2001, Respon-

---

**8.** Dr. Johnson had previously evaluated whether the conditions of an inmate's confinement had rendered the inmate unable to make a voluntary decision and she had assessed the competency of inmates or criminal defendants on numerous occasions. (R.T. 3/8/01 at 7.) Dr. Johnson's curriculum vitae reflected that she had expertise in the areas of competency to stand trial, right to receive/refuse treatment, and criminal forensics. It

also reflected that she taught and lectured extensively. *See* Curriculum vitae for Dr. Johnson attached to Dkt. 162.

**9.** ADOC Department Order 201 regulates information release. Section 1.3 precludes news media representatives from "access to prisons/facilities for the purpose of interviewing inmates." ADOC Dept. Orders 201.02

dents escorted a television reporter and a film crew through SMU II. ADOC staff was interviewed about Mr. Comer, his background, and his conditions of confinement, and Mr. Comer was filmed without his consent. Two segments about Mr. Comer were subsequently broadcast, in which Mr. Comer was described as Arizona's Hannibal Lecter, a fictional cannibalistic serial killer.[10] (*See* Dkt. 269.)

The Court set a status hearing for Respondents to explain why they delayed more than a month after the shank was found, and weeks after the media broadcasts, before filing a motion to rescind contact visitation. Hearings were held in June 2001, but Respondents failed to provide a satisfactory explanation. The Court was informed, however, that Mr. Comer's cell was being modified so that his bunk, commode and sink were made from a special type of metal to diminish his ability to make weapons, and that his desk would be removed entirely. (R.T. 6/21/01 at 21–23.) Dr. Johnson expressed a concern that the media event and change in Mr. Comer's

conditions of confinement might introduce additional issues relevant to her evaluation of his conditions of confinement, and therefore delay her final report because she would need to reassess the changed conditions. She advised the Court and the parties that to the extent such disruptions could be eliminated, consistent with the security of the institution, the more expeditiously she would be able to complete her assignment.

After briefing and hearings, the Court rescinded the contact visit order because Mr. Comer refused to disclose the location of the missing metal, ADOC could not find it, making contact visits too risky. (Dkt. 236.) Further, after extensive briefing and numerous hearings regarding ADOC's contact with the media concerning Mr. Comer, the Court ordered that a record of any further media contacts with Mr. Comer be provided by Respondents to the evaluating experts. The Court also accepted Respondents' proposal to adhere to specific rules with respect to media contacts involving Mr. Comer.[11]

(1.2–1.3)(Sept. 1, 1996); http://www.adc.state.az. us:80/Policies/201.htm.

Department Order 201.02 further generally prohibits ADOC from volunteering disclosure of "non-confidential Department records" or information not "specifically requested." *Id.* Finally, employees are required to "immediately notify" the Public Information Officer of all media inquiries, and are barred from responding to news media representatives's inquiries "unless authorized by [a Department order], the Director, or the [Public Information Officer]," ADOC Dept. Order 201.05 (Sept. 1, 1996). Exceptions to these requirements "shall be allowed only when approved in writing by the Director." ADOC Dept. Order 201.08(1.5). Respondents did not clarify whether the Director gave written approval for an exception to these requirements before FOX news was permitted to film Mr. Comer.

10. Respondents were subsequently ordered to provide a copy of these broadcasts to the experts and to file a copy with the Court. (Dkt. 269.) In one episode, it was incorrectly

reported that this Court, without the consent of ADOC, permitted contact visits with Mr. Comer despite his proclivity for making and using certain dangerous weapons. Whether the erroneous information in the broadcasts was the mistake of the reporter or personnel at ADOC was never determined. Habeas counsel objected to the news report arguing that it placed Mr. Comer in danger of violence from other prisoners seeking to enhance their reputation in prison by challenging him.

11. On October 15, 2001, Respondents notified the Court and parties that a local television station had requested an interview with Mr. Comer. (Dkt. 291.) On October 22, 2001, special counsel filed a notice that Mr. Comer declined to be interviewed. (Dkt. 301.) Following a hearing on October 24, 2001, the Court ruled that Mr. Comer's notice declining to be interviewed constituted his refusal to be interviewed pursuant to ADOC policies. (Dkt. 302.) On June 6, 2002, Respondents filed another "Notice of Request for Interview with Petitioner," but Mr. Comer apparently inde-

**1023**

## B. Dietary Issues

During a status hearing on September 4, 2001, Dr. Johnson expressed concern that Mr. Comer might not be eating sufficient food in light of his activity level, noted his complaints that he was always hungry, and reported an observable weight loss.[12] (R.T. 9/4/01 at 17.) Insufficient food, she explained, could adversely affect his mental state which would require her to reassess his competency. (R.T. 9/4/01 at 21–22.)

Respondents acknowledged awareness of Dr. Johnson's concerns, and reported that ADOC had begun monitoring whether Mr. Comer accepted his meal trays and whether he appeared to be eating. (*Id.* at 16–17.) In addition, Respondents reported that an ADOC physician and the ADOC Facility Health Administrator ("Health Administrator") visited Mr. Comer at his cell to conduct a medical examination, but Mr. Comer refused to cooperate. They stated, however, that he did not appear to be in "acute distress," from their observations from outside his cell. (*Id.* at 15–16, 25.) The Court instructed Respondents to apprize the court, the parties and Dr. Johnson of Mr. Comer's mental and physical status. (*Id.* at 23–25.)

At a status hearing held on October 1, 2001, habeas counsel asked that ADOC be ordered to provide Mr. Comer vegetarian meals without requiring him to meet the ADOC regulation for vegetarian meals.[13] The Court learned that Mr. Comer had supplemented the non-meat portion of his ADOC meals with commissary items. The

Court declined to order ADOC to make an exception to its policy concerning the provision of vegetarian meals to inmates based in part on Respondents' representations that Mr. Comer had commissary privileges. (*Id.* at 18.)

On October 18, 2001, at the request of habeas counsel, an emergency hearing was held regarding Mr. Comer's health. At the hearing, habeas counsel reported that Mr. Comer had informed her that he lacked the strength to leave his cell for recreation or exercise. (*Id.* at 7.) The Court learned from Respondents that Mr. Comer had been found guilty of a major and a minor violation for unidentified conduct on August 31, 2001, and sanctioned with a thirty and fifteen-day loss of commissary privileges. (R.T. 10/18/01 at 9–10.) Respondents informed the Court that the revocation of those privileges did not take effect until Monday, October 15, 2001, and would be in effect for thirty days. The Court also learned that as of October 15, ADOC staff observed packages of "Honey Buns," Mr. Comer's favorite commissary item, in his cell. (R.T. 10/18/01 at 27–28.) Additionally, Respondents reported that since October 15, Mr. Comer had refused five or six meals. (*Id.*) The Court directed Respondents to medically evaluate Mr. Comer's condition; determine the date and nature of the rule infraction; provide and explain ADOC's vegetarian meal policy; and submit its procedures regarding ADOC's response to inmates who engage in hunger strikes. (*Id.* at 28–30.)

pendently agreed to be interviewed for two published articles. (Dkt. 428.) *See* Paul Rubin, *Arizona's Worst Criminal*, Phoenix New Times, May 2, 2002, at 63; Paul Rubin, *Dead Man Talking*, Phoenix New Times, June 27, 2002, at 60. The Court is unaware of how this came about, but no objection was made by any of the parties.

12. Mr. Comer informed Dr. Johnson that he had become a vegetarian two or more years previously and had not eaten meat for at least two years. This was a personal decision and not a consequence of religion or faith.

13. Under ADOC policies, an inmate can receive vegetarian meals based on the religious tenets of the inmate's faith or if medically required. (R.T. 10/19/01 at 9–10.)

At a hearing on October 19, ADOC medical staff reported that Mr. Comer had refused to consent to a medical examination on October 18 and 19, 2001.[14] (R.T. 10/19/01 at 4–5, 6.) Also, the Health Administrator reported that only thirteen percent of Mr. Comer's meals (of 2,800 calories daily), was comprised of protein or meat. (*Id.* at 9–10.) It was undisputed that Mr. Comer never requested a vegetarian diet pursuant to the ADOC policy because his decision to become a vegetarian was not faith based and he did not have a medical condition that made vegetarian meals necessary. Finally, the Health Administrator summarized ADOC's procedures for inmates who became endangered as a consequence of a "hunger strike," described as the refusal of meals for seventy-two hours, or nine meals. (*Id.* at 11.) He testified that the prisoner would be monitored, and if his health deteriorated, a decision would be made whether hospitalization and force-feeding was required. (*Id.* at 11–12, 13–14.)

Significantly, the Court learned that Mr. Comer's major rule infraction was for threatening a corrections officer who had issued him a minor violation charge for passing or "fishing" materials to another inmate.[15] (R.T. 10/19/01 at 18–19.) Moreover, Mr. Comer waived his right to attend the disciplinary hearing, and was notified the same day that he had been found guilty and sanctioned to a thirty day loss of commissary privileges. (*Id.* at 19–20.)

In light of the evidence, the Court found that ADOC's vegetarian meal policy was not irrational and that by his own admission it did not apply to Mr. Comer. The Court refused to interfere with ADOC's discipline of Mr. Comer for the infractions nor did the Court order ADOC to make a special exception to its vegetarian meal policy for Mr. Comer.[16] (*Id.* at 30–33.) *See Turner v. Safley,* 482 U.S. 78, 89, 90–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *accord Lewis v. Casey,* 518 U.S. 343, 361, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The Court found that Mr. Comer had voluntarily made the choice not to eat any portion of the meals provided by ADOC, but it ordered ADOC to continue monitoring Mr. Comer's physical and mental condition. (*Id.*)

Mr. Comer's commissary privileges were reinstated following the expiration of the sanction period without further Court involvement. He appeared healthy and not underweight at the time of the competency hearing in March 2002 and the Court's visit with him at ADOC in April 2002.

*III.   Second Expert Evaluation*

After Dr. Johnson's report was filed in late September 2001 finding Mr. Comer competent and his decision voluntary, habeas counsel renewed requests for the appointment of Dr. Terry Kupers, a psychiatrist, and Dr. Craig Haney, a psychologist and attorney, as their experts. Both were appointed, and the evidentiary hearing was scheduled to commence on January 22, 2002.[17]

**14.** According to Respondents, Mr. Comer had last consented to a medical examination in May, 2000, and refused an annual medical examination in January, 2001.

**15.** "Fishing" refers to the illicit transmission of items from one cell to another. In this case, Mr. Comer was charged with fishing envelopes and magazines to another inmate. (*Id.* at 19.)

**16.** At the competency hearing, Mr. Comer testified that he only studied the Buddhist religion, but he had never declared Buddhism as his religion. (R.T. 3/27/02 at 388.)

**17.** Dr. Haney was subsequently forced to withdraw from participation due to a serious family illness. Habeas counsel did not seek the appointment of another expert in his place.

Dr. Kupers met with Mr. Comer on November 28 and 29, 2001, and again on January 11, 2002. Habeas counsel filed a motion to continue the evidentiary hearing to allow Drs. Kupers and Haney sufficient time to complete their evaluations. Mr. Comer, who appeared telephonically, strongly objected to a continuance and threatened not to cooperate with their evaluations. (*See* R.T. 1/11/02 at 4–9, 13–17.) The Court expressed understanding of Mr. Comer's frustration with the delay, but made it clear that it could not legally determine his competency and the voluntariness of his decisions without consideration of habeas counsel's expert's opinions. (*Id.*) He was told his cooperation was necessary and, if he did not cooperate, the Court's task would be incomplete, resulting in a return of the case to the appellate court for possible resolution of the habeas petition. (*Id.*) To ensure that Drs. Kupers and Haney had sufficient time to complete their evaluations, the evidentiary hearing was reset to March 26–28, 2002. (Dkts. 349 & 353.)

Mr. Comer cooperated and Dr. Kupers completed his evaluation and submitted a report on March 19, 2002. Dr. Kupers concluded that Mr. Comer suffered from depression, post-traumatic stress disorder, and SHU Syndrome,[18] and, consequently, he was not mentally competent to waive further legal review. Dr. Kupers further found that the conditions of Mr. Comer's confinement rendered his decision to waive further legal review involuntary. (Ex. 1 to Dkt. 383.)

## IV. Changes in Mr. Comer's Conditions of Confinement, January 2002

Beginning sometime in January 2002, Mr. Comer was permitted to have in his cell for the first time in several years a radio cassette player, and a television, in recognition of the absence for six months of any significant disciplinary infraction. (R.T. 3/26/02 at 272–73, 280, 282–83; R.T. 3/27/02 at 535–37, 546–47, 550–51; R.T. 3/28/02 at 836, 873.) As Deputy Warden Marshall explained at the competency hearing, he had promised Mr. Comer a radio cassette player and a television if he did not have a significant disciplinary write-up for six months. (R.T. 3/27/02 at 535–37, 546–47, 550–51.)

## V. Evidentiary Hearing, Prison Tour and Briefing

The Court required counsel to agree on a fair allocation of the time for presentation of evidence at the evidentiary hearing. Counsel complied. In addition, the Court considered Respondents' motion to hold the hearing at SMU II, rather than the Federal Courthouse, because of security concerns in transporting Mr. Comer to Phoenix. Habeas counsel opposed the motion; special counsel sought to ensure that

18. "SHU Syndrome" stands for Security (or alternatively, Segregated or Supermax) Housing Unit Syndrome, which has been identified by some mental health professionals as a collection of psychological symptoms experienced by inmates confined in cells with little social interaction or other sensory stimulus, particularly for lengthy periods of time. *See* David McCord, *Imagining a Retributivist Alternative to Capital Punishment*, 50 FLA. L. REV. 1, 98–103 (January 1998); Sally Mann Romano, *If the SHU Fits: Cruel and Unusual Punishment at California's Pelican Bay State Prison*, 45 EMORY L.J. 1089, 1092 (Summer 1996); Nan D. Miller, *International Protection of the Rights of Prisoners: Is Solitary Confinement in the United States a Violation of International Standards?* 26 CAL. W. INT'L L.J. 139, 156 (Fall 1995). The symptoms are also denominated as Ad Seg Syndrome or Reduced Environmental Stimulus Syndrome ("RES Syndrome"). *See* Miller, *International Protection of the Rights of Prisoners*, 26 CAL. W. INT'L L.J. at 162; *see also* McCord, *Imagining a Retributivist Alternative to Capital Punishment*, 50 FLA L. REV. at 114; Romano, *If the SHU Fits*, 45 EMORY L.J. at 1129.

Mr. Comer would be physically present whether the hearing was held at SMU II or at the Federal Courthouse. (Dkts. 376 & 419.) After numerous planning meetings with the United States Marshal's Service, working with ADOC security, the Court ordered that Mr. Comer participate by video-conference at the hearing on March 26, 2002. The Court further ordered that if he complied in all respects with the orders of the transporting officers, he would be transported to Phoenix to appear in person on March 27 and 28. Mr. Comer persuaded the Court that he understood what was required of him and was committed to adhere to the requirements.[19]

On March 26, 2002, Mr. Comer cooperated with the transporting officers and was transported without incident to a secure prison facility in Florence, Arizona, where he participated during the hearing with special counsel by video-conference. Because of his cooperation on the first day of the proceedings, Mr. Comer was transported without incident to Phoenix where he appeared at the hearing in person on March 27 and 28. Again, he cooperated in all respects with security personnel during the last two days of the hearing. For security reasons, Mr. Comer was not permitted to testify from the witness box and was seated approximately twenty-five feet from the Court and twenty feet from habeas counsel. Because of this distance the Court was unable to clearly observe his demeanor. Thus, his testimony was video-taped without objection for review by the Court before rendering its decision, and for counsel's preparation for briefing. It was filed under seal for appeal to the Ninth Circuit.

After the hearing, and without objection, on April 6, 2002, the Court and counsel for all the parties toured the portions of ADOC in which Mr. Comer had been, and is presently, housed since his incarceration began at ADOC, including CB6, SMU I and SMU II. The Court and counsel inspected the various cells, as well as the shower and recreation areas. Mr. Comer was present when his cell was inspected, and answered questions posed by the Court in the presence of all counsel.

Finally, the parties submitted proposed findings of fact and conclusions of law. (Dkts. 399, 402 & 413.) Respondents filed objections and a response to habeas counsel's proposed findings and conclusions. (Dkt. 407.) Special counsel also filed objections to habeas counsel's proposed findings and conclusions. (Dkt. 423.) Habeas counsel filed responses to Respondents' and special counsel's proposed findings and conclusions.[20] (Dkts. 414 & 420.)

Habeas counsel argues that Mr. Comer is not competent to waive his habeas appeal because he suffers from three mental disorders: depression, post-traumatic stress disorder ("PTSD") and SHU syndrome. Counsel further argue that the conditions of Mr. Comer's confinement at ADOC, and his conditions at the California Department of Corrections resulted in

---

**19.** Because Mr. Comer was designated by ADOC at the highest level for risk of escape and violence, the U.S. Marshal and the Court conferred and designed special security procedures to be implemented during the hearing. These included the use of a belly chain and a stun belt. Also, Mr. Comer was positioned very close to the door where he entered the courtroom and sat between his two special counsel; he was not permitted to move from his seat; four ADOC corrections officers and four U.S. Marshals were strategically positioned in the courtroom; a special magnetometer was used outside the courtroom to screen visitors and; the visitors were seated in specially designated portions of the audience.

**20.** Habeas counsel also filed a motion to strike certain exhibits submitted by special counsel after the hearing. (Dkt. 424.) That motion was granted. (Dkt. 432.)

PTSD and SHU syndrome, and in turn, have rendered his decision to waive further legal review involuntary.[21] Special counsel argues that Mr. Comer has the capacity to make the decision to terminate representation by habeas counsel and to waive further legal review and that his decisions to do so are not rendered involuntary by his present and/or past conditions of confinement. Respondents agree that Mr. Comer has the mental capacity to make the decision to terminate representation by habeas counsel and to waive further legal review.

## DISCUSSION

There are two issues before this Court. First, whether Mr. Comer is competent to dismiss habeas counsel· and abandon his habeas appeal. The second is whether Mr. Comer's decision to dismiss counsel and abandon his appeal has been rendered involuntary in light of his conditions of confinement.

The Court has been cognizant from the outset of the solemnity of the decision before it. First, there is the obvious—death is a one-way street—but the Court is also aware that its findings of fact and credibility decisions will be accorded significant deference. *See* Fed.R.Civ.P. 52(a); *Mason v. Vasquez*, 5 F.3d 1220, 1224–25 (9th Cir.1993). These realities have led the Court to anguish over its decision and ultimately over the question ‚of whether any healthy person, choosing between being and not being, could ever freely choose the terrifying ignorance of what may follow death, over enduring the ordeal of life.[22]

Resolving whether Mr. Comer's decision has been competently made without coercion has required immersion into the details of Mr. Comer's life to gain an intimate understanding of him as a person, including learning and evaluating all meaningful aspects of how he presently lives, and of everywhere he has lived while incarcerated, which were not the simplest of tasks. It has required rigorous study of numerous papers, pleadings, and his writings, and most significantly, it has required listening to him, watching him testify, and carefully examining the evaluations of him conducted by qualified psychiatrists and a psychologist. In the end, the Court is confident of its factual and legal decision that Mr. Comer has competently and voluntarily made his dire choice, though the Court will never be comfortable with it.[23]

---

21. Habeas counsel argues the Court must "assess [Mr. Comer's] competence with reference to his *capacity to rationally decide the specific decision posed.* Second, the Court must employ a heightened standard for evaluating competence if the potential consequences of the decision are grave." (Dkt. 365 at 6.) They argue the standard for evaluating Mr. Comer's competence to waive his appeal "should be uniquely high" because it is essentially an election to die. (*Id.*, citing *Miller v. Stewart*, 231 F.3d 1248, 1250 (9th Cir.2000)). For this reason, habeas counsel argues that at a minimum the Court should employ the standard used to evaluate the voluntariness of the waiver of a constitutional right, such that it must be determined whether Petitioner has "that degree of competence required to make decisions of very serious import" so that he is not competent to waive appeal "if mental illness has substantially impaired his … ability to make a reasoned choice among the alternatives presented and to understand the nature and consequences of waiver." (Dkt. 365 at 7, quoting *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir.1981)).

22. Who would these fardels bear,
To grunt and sweat under a weary life,
But that the dread of something after death,
The undiscovered country from whose bourn
No travelers returns, puzzles the will,‚
And makes us rather bear those ills we have
Than fly to others that we know not of?
William Shakespeare, *Hamlet*, act 3, sc.1.

23. The Court read a number of articles that provide a rich lode of interpretive material on the issues before the Court. *See* Ross E. Eisenberg, *The Lawyer's Role When the Defen-*

## I. Guidance for Determining Competency and Voluntariness Set Forth in the Ninth Circuit Opinion

The Ninth Circuit remanded this case for an evidentiary hearing, and the majority expressed its "grave concerns that a mentally disabled man may be seeking this court's assistance in ending his life," mandating "an evidentiary hearing to determine if [Mr. Comer] can validly withdraw his consent to proceed with this appeal." *Comer v. Stewart*, 215 F.3d 910, 916 (2000). The Ninth Circuit directed this Court, after considering medical and psychiatric evaluations offered by the parties, to:

> determine "whether [Petitioner] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314, 86 S.Ct. 1505, 16 L.Ed.2d 583.

*Id.* The Ninth Circuit also expressed concern regarding the voluntariness of Mr. Comer's decision noting that, "we and other courts have recognized that prison conditions remarkably similar to Mr. Comer's descriptions of his current confinement can adversely affect a person's mental health." *Id.* at 915–16.

## II. History and Present Conditions of Confinement of Mr. Comer

Although the Ninth Circuit expressly disavowed any intention that this Court assess whether the conditions of confinement on Arizona's death row, *i.e.*, in SMU II, violate the Eighth Amendment, it directed this Court to assess whether Mr. Comer's conditions of confinement have rendered his decision to waive further review involuntary. In addition, the conditions of his confinement in the California Department of Corrections ("CDC") figure in the experts' evaluations regarding whether Mr. Comer suffers from a mental disorder. Therefore, an overview of those conditions is included below.

### A. Conditions ·in Soledad, DVI and Folsom Security Housing Units

Between 1979 and 1984, Mr. Comer was incarcerated at the Corrections Training Facility at Soledad ("Soledad"), Deuel Vocational Institute at Tracy ("DVI"), and Folsom Prison. Mr. Comer was incarcerated at Soledad between April and October, 1979. On October 19, 1979, Mr. Comer escaped from Soledad. (*See* ER 25, Habeas Ex. Vol. 1, Dkt. 383.) In May 1980, Mr. Comer was apprehended in Dallas, Texas, returned to CDC custody, and assigned to Unit IV at Soledad, a Segregated Housing Unit ("SHU"), where he remained for approximately eight months until February 1981, when he was transferred to general population at Folsom as

dant Seeks Death, 14 Cap. Defense J. 55 (Fall 2001); C. Lee Harrington, *A Community Divided: Defense Attorneys and the Ethics of Death Row Volunteering*, 25 Law & Soc. Inquiry 849 (Summer 2000); Mathew T. Norman, *Standards and Procedures for Determining Whether a Defendant is Competent to Make the Ultimate Choice–Death; Ohio's New Precedent for Death Row Volunteers*, 13 J. Law & Health 103 (1998–99); Julie Levinsohn Milner, *Dignity of Death Row: Are Death Row Rights to Die Diminished? A Comparison of the Right*

to Die for the Terminally Ill and the Terminally Sentenced, 24 N.E. J. Crim. & Civ. Confinement 279 (Winter 1998); Christy Chandler, Note, *Voluntary Executions*, 50 Stan. L. Rev. 1897 (July 1998); Sally Mann Romano, *If the SHU Fits: Cruel and Unusual Punishment at California's Pelican Bay State Prison*, 45 Emory L.J. 1089 (Summer 1996); Jane L. McClellan, Comment, *Stopping the Rush to the Death House: Third–Party Standing in Death–Row Volunteer Cases*, 26 Az.St. L.J. 201 (Spring 1994).

a Level IV inmate. (*See id.*) Mr. Comer remained in general population at Folsom until September 8, 1982, when he was slashed in the neck by another inmate and seriously injured. (*See id.*) Following emergency treatment outside the prison, Mr. Comer was reassigned to a Folsom SHU [24] based on the attack and remained there for approximately six months. (*See id.*) In February 1983, Mr. Comer was transferred from Folsom to a DVI SHU. (*See id.*) In August 1984, Mr. Comer was paroled. In total, Mr. Comer was confined to Soledad SHUs for approximately eight months from June 1980 until February 1981, to Folsom SHUs for approximately six months from September 1982 until February 1983, and to DVI SHUs for as long as seventeen months. [25]

Prior to and continuing through the period of Mr. Comer's confinement in Soledad, Folsom and DVI SHUs, a class action [26] was litigated regarding the conditions of confinement in those SHUs. [27] *See Wright v. Rushen,* 642 F.2d 1129, 1135 (9th Cir.1981); *Toussaint,* 553 F.Supp. at 1368 n. 1; *see also* McCord, *Imagining a Retributivist Alternative,* 50 FLA. L. REV. at 99; Romano, *If the SHU Fits,* 47 EMORY L.J. at 1097–1106; Miller, *International Protection of the Rights of Prisoners,* 26 CAL. W. INT'L L.J. at 156–60. On November 3, 1980, the district court issued a preliminary injunction requiring the CDC to implement steps to ameliorate the conditions in the SHUs at the four institutions and to establish procedures with respect to the assignment of inmates to those units. *See* Appendix to *Wright v. Rushen,* 642 F.2d 1129 (9th Cir.1981). However, on March 13, 1981, the Ninth Circuit vacated the injunction and remanded for application of the appropriate standard. *See Wright,* 642 F.2d at 1135.

The class renewed its motion for a preliminary injunction, and, on January 14, 1983, the district court issued a new preliminary injunction concerning the conditions of confinement in the SHUs at So-

---

**24.** It appears Mr. Comer was held in Folsom's SHU II, which is described further below, but it is unclear whether that is the only Folsom SHU in which he was confined.

**25.** It is unclear from the CDC records submitted to the Court the length of Mr. Comer's confinement to DVI's SHU, but both Mr. Comer and Dr. Terry Kupers testified that Mr. Comer was assigned for some period of time to DVI SHUs, including K–Wing. (R.T. 3/26/02 at 35; R.T. 3/27/02 at 344–45.) *See Toussaint v. Rushen,* 553 F.Supp. 1365, 1368 n. 1 (N.D.Cal.1983), *aff'd in part and rev'd in part sub nom., Toussaint v. Yockey,* 722 F.2d 1490, 1491 (9th Cir.1984).

**26.** The class, certified February 25, 1976, consisted of three sub-classes: (1) all prisoners confined and/or subject to being confined in maximum security units at the four institutions as a result of disciplinary procedures; (2) all prisoners so confined who knowingly and voluntarily requested confinement in such units; and (3) all prisoners confined in such units or subject to being so confined who were not included in sub-class (1) or (2),

including those confined for "administrative" reasons. *See Wright v. Enomoto,* 462 F.Supp. 397, 398 (N.D.Cal.1976), *aff'd* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). In a later decision, the district court noted that class members could be defined "principally by reference to the percentage of each day that they [were] required to spend in their cells" and "not permitted to mingle with general population inmates" and who were only allowed out of their cells for showers, exercise, visits, medical treatment and classification hearings. *See Toussaint v. McCarthy,* 597 F.Supp. 1388, 1393 (N.D.Cal.1984), *aff'd in part and rev'd in part,* 801 F.2d 1080 (9th Cir.1986).

**27.** The class action also challenged the conditions of confinement in San Quentin SHUs. In addition to challenging the conditions in these SHUs, the class action challenged the absence of consistently applied procedures with respect to the assignment and retention of inmates in SHUs.

ledad, DVI and San Quentin.[28] *See Toussaint v. Rushen*, 553 F.Supp. 1365, 1368 n. 1, 1385 (N.D.Cal.1983). The district court made detailed findings regarding the conditions at those institutions.

With respect to SHUs at Soledad and DVI, in which Mr. Comer was confined between May 1980 and February 1981 (Soledad) and between February 1983 and August 1984(DVI), respectively, the court found that approximately one-fifth of Soledad's total inmate population was housed in its SHUs and that approximately one-third of DVI's total inmate population was housed in DVI's SHUs. The court determined that such placement was arbitrary, lengthy, indefinite, and without the benefit of procedural protections. *Toussaint*, 553 F.Supp. at 1370. The court also found that the capriciousness with which inmates were assigned to the SHUs intensified the "debilitating effects" on them of the conditions in those units. *Id.*

The physical conditions of the cells in the units were described as follows: The cells measured five or six feet wide and eight to nine feet long, furnished with a bed "of some sort" and thin mattress, a pillow and blanket, a coverless toilet and a sink. *Id.* at 1371. Many cells were windowless and were primarily lighted only by a single bulb of "inadequate wattage." *Id.* The court found inmates were, at best, irregularly provided changes of clothing, bedding and linens, and at worst, weeks or even months could elapse before an inmate was provided with clean clothing, bedding and linens. *See id.* The court found the cells in the units lacked adequate heating and ventilation, causing them to be hot and stuffy in the summer and cold in the win-

ter, and that the antiquated and inadequate plumbing frequently resulted in leaking toilets, wet floors, water shutdowns and an inability to flush toilets.[29] *See id.* at 1371, 1372. The court also found rodents, insects, dirt and excrement present in the cells in the units, and that inmates were not provided with the means to clean their cells. *See id.*

The court found that inmates spent as many as twenty-three and one-half hours a day in their cells and, to their detriment, most did not receive daily exercise. *See id.* at 1372–73. It also found many inmates were denied contact visits with family or friends, and that delivery and mailing of inmate correspondence was often obstructed by corrections staff. *See id.* at 1374. The court further found the lack of vocational, educational and recreational activities exacerbated boredom, tension and idleness. *See id.* at 1373. It found that SHU inmates experienced difficulty in obtaining reasonably prompt access to necessary medical, dental and psychiatric treatment. *See id.* at 1374. In addition to all of these conditions, the court found that despite the tiny size of the cells, there was substantial involuntary double-celling in the units. *Id.* at 1371. It found that double-celling, in conjunction with the other conditions in the units, engendered "violence, tension, and psychiatric problems." *Id.* at 1372. It also found that the arbitrariness with which inmates were consigned to the units, together with the lengths and conditions of such confinements, and the absence of procedural safeguards, seriously debilitated the physical and psychological well-being of inmates. *See id.* at 1374–76. The court concluded that double-celling of inmates

---

**28.** The plaintiffs elected not to present evidence concerning Folsom. *See id.* at 1368 n. 1. The Soledad units addressed in the order were the Security Housing Unit, Management Control Unit, Protective Housing Unit No. 1 and Protective Housing Unit No. 2. *See id.*

**29.** The court noted that defendants admitted there were leaking toilets and that they considered making the inmates use covered chamber pots. *See id.*

and the failure to provide adequate sanitation, lighting, heating, ventilation, plumbing, exercise, visitation, medical care, and procedural safeguards, among other deficiencies, in the units was inconsistent with notions of human decency and posed serious questions regarding the CDC's compliance with the federal and state constitutions. *See id.* at 1379–81. It enjoined the CDC to correct many of the deficiencies.[30]

On October 18, 1984, the court issued findings of fact and conclusions of law regarding the conditions in the SHUs at Folsom and San Quentin,[31] and entered a permanent injunction with respect to those units.[32] *See Toussaint v. McCarthy*, 597 F.Supp. 1388 (N.D.Cal.1984), *aff'd in part, rev'd in part and vacated and remanded in part*, 801 F.2d 1080 (9th Cir.1986).[33] As noted above, Mr. Comer was confined in

Folsom's SHUs between September 1982 and February 1983.

With respect to conditions in Folsom's SHUs, the court found that Folsom was one of the oldest penal institutions still in use in the United States and that the majority of inmates confined to its SHUs were confined in its SHU II.[34] *See id.* at 1393 n. 4. It found little natural light present in the units and the artificial lighting so dim as to make reading and writing difficult, if not impossible. *See id.* at 1393, 1394, 1397. It found the noise levels, particularly in SHU II, substantially exceeded standards set for prisons, and filled the units day and night with "unrelenting, nerve-racking din," including blaring televisions, radios, inmates shouting to one another and clanging cell doors.[35] *See id.* at 1397, n. 15. It found this "unceasing

**30.** The court noted that substantial evidence had been presented regarding conditions that might constitute cruel and unusual punishment, including (1) the inadequate size and furnishing of cells; (2) the denial of family visitation; (3) the constant din of noise; (4) unpreparedness in case of fire; (5) the level of guard brutality against inmates; (6) the absence of educational and vocational opportunities; (7) the lack of religious services for all inmates; and (8) excessive security. *See id.* at 1383. However, the court declined to grant preliminary injunctive relief with respect to those conditions because "*inter alia,* of the capital expenditures needed to correct them," but without prejudice to plaintiffs seeking relief at trial. *See id.*

**31.** The court noted that CDC policies called for housing only Level IV inmates at Folsom and San Quentin. It described those inmates as requiring the highest level of security in custody based on precommitment history, commitment offense, term of imprisonment, and other factors. *See id.* at 1394. Inmates were assigned to those prisons' segregated units as punishment for disciplinary infractions, management control, their own protection, or pending a determination regarding permanent assignment to segregated status. *See id.* at 1393–94. It described the inmates assigned to Folsom and San Quentin SHUs,

including many of the plaintiffs, as among the "most antisocial and violent of the inmates" at Folsom, and at San Quentin those who posed "formidable behavior problems for correctional staff." *Id.* at 1394.

**32.** The district court explained that it bifurcated trial with respect to Folsom and San Quentin from DVI and Soledad based on representations by CDC officials that administrative segregation would be discontinued at DVI and Soledad. *See id.* at 1391. By the time the permanent injunction was entered Mr. Comer had already been paroled.

**33.** The Ninth Circuit found certain provisions of the permanent injunction overbroad. Inasmuch as Mr. Comer was released from CDC custody in August 1984, this Court only discusses the district court order and appellate opinion to the extent that the conditions of confinement in Folsom SHUs are described.

**34.** Records submitted by habeas counsel reflect that Mr. Comer was held in Folsom's SHU II for some period of time.

**35.** Cells in SHU I at Folsom, which were separated by floors with cell fronts facing enclosed corridors, were somewhat less noisy. *See id.*

racket exert[ed] a profound impact on lockup inmates, some of whom consider[ed] it the single worst aspect of their confinement" and contributed to difficulty sleeping and adversely affected their mental health. *Id.* at 1398.

The court described the average cell size in SHU II as 49.5 square feet and 45.5 square feet in SHU I, with each cell furnished with one or two bunks, a coverless toilet, a sink, a shelf and a small mirror. *See id.* at 1394. Despite the small size of the cells, inmates were frequently double-celled and despite the double-celling, SHU inmates were nearly perpetually confined, except for sporadic exercise, showers, visitation, and hearings or medical treatment. *See id.* at 1393, 1401–1402. The court found it not uncommon for an inmate to remain in his cell for five or more consecutive days at a time. *See id.* at 1395. It further found that the prolonged idleness of SHU inmates adversely affected their mental health, *see id.* at 1403, and that the extensive double-celling "in the midst of the other abhorrent conditions ... engender[ed] tension and psychiatric problems" as well as "violence, particularly violence between cellmates." *Id.*

Among the "other abhorrent conditions" found by the court was inadequate heating and ventilation in SHU II and the entry of moisture through leaky roofs and overflowing sinks, toilets and showers. *Id.* at 1396. It found that a "putrid odor" lingered in the units because of poor ventilation. *See id.* It found "the plumbing and sewage disposal systems antiquated, deteriorated, and in need of replacement" and leaking toilets and sinks prevalent, which increased the damp and cold of the units. *Id.* It found the pipe chases behind the back walls of the cells exhibited numerous pipe leaks and sewage mains and steam water lines with accumulations of rotting garbage and human waste that fostered infestations of vermin and posed a "sub-

stantial hazard" to the health of the inmates. *Id.* at 1396–97. Despite these conditions, the court found that inmates were not provided with clean clothing and bedding on a regular basis or supplies to clean their cells. *See id.* at 1399. It also found inmates were not afforded regular access to showers and that the shower facilities were "revolting" due to accumulated filth, clogged drains and standing water. *Id.* It described the sanitation in the units as generally deplorable in part because inmates were instructed to throw trash onto walkways, which were infrequently cleaned, and debris clogged the gutters. *See id.* at 1400.

The court also found SHU II infested with cockroaches, mice and rats. *See id.* It found the Folsom kitchen facility exhibited: (1) active infestations of rats, roaches and flies; (2) pools of standing water; (3) poor ventilation resulting in heavy deposits of grease and grime on exposed surfaces that could contaminate food; (4) exposed electrical wires; (5) unsanitary food preparation surfaces; (6) dried food residue on food preparation equipment; and (7) greasy, slippery floors. *See id.* at 1401. It noted that "[f]ood [served to SHU inmates] often arrive[d] contaminated with foreign objects such as roaches, hair, and incredibly, bits of plastic from shoes" and food preparers were sometimes directed to use spoiled cheese or meat in sandwiches which made inmates ill. *Id.* Finally, the court described a small number of cells in Folsom's SHUs that had solid outside doors and no window or only a small window, which the guards, who controlled the lighting, could make completely dark for long periods of time ("quiet cells"). *Id.* at 1395.

It is undisputed that Mr. Comer endured most, if not all and possibly worse, of these deplorable conditions while he was confined in SHUs at Soledad, DVI and Folsom.[36] Furthermore, Dr. Terry Ku-

---

**36.** Declarations of plaintiffs' experts in *Wright* have been submitted as exhibits by habeas

pers, habeas counsel's expert, was an expert witness for the plaintiffs in *Toussaint* and visited Folsom's and DVI's SHUs, and in fact, toured Folsom SHUs while Mr. Comer was confined there. (R.T. 3/27/02 at 342–43.) During his testimony in this case, Dr. Kupers synoptically corroborated the findings of the district court in *Toussaint* and elaborated on certain features of Folsom's SHUs. Dr. Kupers testified that Folsom SHUs contained "Intensive Custody Units" in which SHU inmates were confined as additional punishment and which lacked any facilities or furnishings and which were usually filthy with only a hole in the floor for a toilet, the flushing of which was controlled by the guards. (R.T. 3/26/02 at 45–46, 56.) Dr. Kupers testified that inmates placed in ICUs were almost completely isolated from others, including guards. (R.T. 3/26/02 at 46.) Based upon his review of the available CDC records and his interviews with Mr. Comer, Dr. Kupers concluded that Mr. Comer spent four or five months in a Folsom ICU. (R.T. 3/26/02 at 46.)

*B. Mr. Comer's Conditions of Confinement While Incarcerated in Arizona*

Following his arrest in February 1987, and while awaiting and during trial, Mr.

Comer was in the custody of the Maricopa County Jail. During that period, Mr. Comer was housed in a single cell twenty-four hours a day. (R.T. 3/26/02 at 50–51.) Mr. Comer reported one incident in which he asked a jail officer to loosen handcuffs that were tight, but the officer further tightened the handcuffs and raised Mr. Comer's arms behind his back. (R.T. 3/26/02 at 51.) Mr. Comer barricaded himself in his cell, armed with a shank, when officers attempted to take him to court for sentencing. (R.T. 3/26/02 at 51–52.) He was forcibly removed and transported to court where he appeared in a wheelchair, naked except for a towel over his midriff. (*Id.*) A doctor for the County examined Mr. Comer and found him competent to be sentenced.

Following his sentencing in April 1988, Mr. Comer was transported to Arizona's death row then located in Cell Block 6 ("CB6"), of the Arizona State Prison in Florence, Arizona. (*See* R.T. 3/26/02 at 53–54.) It was there that Mr. Comer met and became friends with another death row inmate, Robert ("Bonsai" or "Banzai") Wayne Vickers.[37] (R.T. 3/27/02 at 352.) A few months later, Mr. Comer and Mr. Vickers were placed in SMU I, because of their disciplinary infractions in CB6, in-

counsel to substantiate the conditions of confinement Mr. Comer experienced in Folsom and Soledad SHUs. (*See* Dkt. 383, ER 24, Declarations of Arnold Pontesso in Support of Plaintiffs' Motion for Preliminary Injunction Following Remand dated 5/81 and to Modify Preliminary Injunction signed 4/18/83; Declaration of Craig Haney in Support of Motion for Preliminary Injunction Following Remand signed 5/1/81; Declaration of Terry A. Kupers, M.D., in Response to Defendants' Opposition to Motion for Preliminary Injunction signed July 23, 1980.)

37. Robert Vickers was first sentenced to death for the murder of a former cellmate, who failed to wake Vickers for a meal and drank Vickers's Kool–Aid, on whose back

Vickers spelled "Bonsai" in puncture wounds. Then in 1982, Vickers threw a burning container of flammable hair tonic into the cell of, and on, another death row inmate in retaliation for a crude remark made by that inmate about Vickers's niece. The inmate died and Vickers was convicted and sentenced to a second death sentence for the latter murder. During his tenure on death row, Vickers was notorious for his ability to manufacture weapons, particularly shanks and darts, out of anything available to him, and for his use of such weapons against inmates and staff. Although Mr. Comer and Vickers were friends, the record does not reflect that Mr. Comer's loyalty to Vickers was consistently reciprocated.

cluding making weapons and assaulting other inmates and staff. (R.T. 3/26/02 at 54; R.T. 3/27/02 at 353, 679–80.) Mr. Comer has reported that on one occasion while housed in SMU I, he was subjected to inverted four-point restraints, *i.e.*, he was placed in four-point restraints (shackled hands and feet) to a stiff board and then inverted with his feet above his head at about a 45˜angle facing downward for several hours. (R.T. 3/26/02 at 55–56; R.T. 3/28/02 at 771, 838, 843–44.)

In 1996, Mr. Comer and Mr. Vickers were moved to SMU II. (*Id.*) In 1997, most of Arizona's other death row inmates were moved from CB6 to SMU II. (R.T. 3/26/02 at 54.) Mr. Comer remains confined to SMU II. He remained close friends with Mr. Vickers until Mr. Vickers's execution on May 5, 1999.

For purposes of this action, the physical layout of SMU I and SMU II do not materially differ. (*See* R.T. 3/26/02 at 58.) SMU I is a few years older than SMU II. (*Id.*) Both units consist of two levels of cells which extend like spokes from an elevated central control booth. (*Id.*) At the end of each spoke, or pod, is an outdoor recreation area measuring twelve feet by twenty feet with high concrete walls and floors and cyclone fencing over the top. (*Id.* at 59.) At times relevant to this matter, Mr. Comer has been held in a single cell measuring seven feet by eleven feet. (*Id.* at 59.) His cell door is covered with a translucent material called Lexan, which prevents materials from being thrown out of, or into, his cell.[38] His cells in SMU I and II have been equipped with a bunk, toilet, sink, desk and stool constructed of metal secured to the concrete walls and floors of the cell. (*Id.*) As noted above, Mr. Comer's cell was modified during the summer of 2001 to remove the desk and stool and to reinforce the bunk to make it more difficult for Mr. Comer to

fashion weapons. (*Id.*) Mr. Comer receives between an hour and an hour and a half of individual recreation three times a week. (R.T. 3/27/02 at 516, 540.) He also has the opportunity to shower three times a week. (R.T. 3/26/02 at 64; R.T. 3/27/02 at 455, 516.) In addition, Mr. Comer has access to cleaning materials. Pursuant to ADOC policy, he and other death row inmates are not permitted "contact" visits absent court order, but he is permitted non-contact visits.

### III. Competency

■ In remanding this case, the Ninth Circuit found the circumstances warranting remand for an evidentiary hearing "virtually indistinguishable" from those in *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966)(*per curiam* ). *See Comer v. Stewart,* 215 F.3d 910, 915–16 (2000). In *Rees,* a condemned Virginia inmate filed, through counsel, a certiorari petition after his federal habeas corpus petition was denied by the district court and the denial affirmed by the Fourth Circuit. *See Rees,* 384 U.S. at 313, 86 S.Ct. 1505. Shortly thereafter, the inmate directed counsel to withdraw the certiorari petition and forego further legal proceedings. *Id.* Counsel advised the Supreme Court that he could not accede to his client's instructions without a psychiatric evaluation of his client because evidence cast doubt on his client's mental competency. *Id.* The inmate was evaluated by a psychiatrist retained by his counsel, who found Rees mentally incompetent. *Id.* Rees was then evaluated by psychiatrists retained by the State of Virginia who expressed doubts that he was insane. *Id.* The Supreme Court remanded to the district court to determine, "in aid of the proper exercise of [the Supreme Court's] certiorari jurisdiction," and "upon due notice to the State and all other interested

---

**38.** Other inmates in his pod also have Lexan on their doors for the same reason.

parties," Rees' mental competence and report back to the Court. *Id.* at 313–14, 86 S.Ct. 1505. Specifically, the district court was directed to:

> determine Rees' mental competence in the present posture of things, that is, whether he has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Id.* at 314, 86 S.Ct. 1505.[39]

In *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the Supreme Court observed that though it had used the phrase "rational choice" in *Rees* to describe the competence necessary to withdraw a certiorari petition, it had not indicated that phrase meant "something different from 'rational understanding' " as used in *Dusky v. U.S.,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). *Godinez,* 509 U.S. at 398 n. 9, 113 S.Ct. 2680.

Since *Rees* was decided, courts have repeatedly applied its direction to evaluate a capital inmate's competency to waive review, but found that condemned inmates who are mentally competent may nevertheless rationally decide to waive legal review of their sentences. *See Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Whitmore v. Arkansas,* 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)("next friend" standing is not available if "an evidentiary hearing shows that the defendant has given a knowing, intelligent and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded"); *see also Brewer v. Lewis,* 989 F.2d 1021, 1027 (9th Cir.1993); *Lenhard v. Wolff,* 603 F.2d 91, 93 (9th Cir.1979). In *Smith v. Armontrout,* 812 F.2d 1050, 1056 (8th Cir.1987), the Eighth Circuit rejected the contention that *Rees* barred waiver of post-conviction review in capital cases based on the mere possibility that the inmate's decision was the product of a mental disease, disorder or defect, citing *Rumbaugh v. Procunier,* 753 F.2d 395, 398–99 (5th Cir.1985), and *Hays v. Murphy,* 663 F.2d 1004 (10th Cir. 1981). The court determined that a literal interpretation of the portion of the *Rees* standard asking whether an inmate suffered from " 'a mental disease, disorder, or defect which may substantially affect his capacity,' would conflict with a similarly literal interpretation of the other half of the test, which asks whether the prisoner has, rather than absolutely, certainly, or undoubtedly has, the capacity to appreciate his position and make a rational choice." *Smith,* 812 F.2d at 1057. The court noted that:

> Though *Rees* recites these two portions of the standard as disjunctive alternatives, there is necessarily an area of overlap between the category of cases in which at the threshold we see a possibility that a decision is substantially affected by a mental disorder, disease, or defect, and that of cases in which, after proceeding further, we conclude that the decision is in fact the product of a rational thought process.

---

**39.** The Supreme Court carried the case on its docket following remand to the district court, *see Rees v. Peyton,* 386 U.S. 989, 87 S.Ct. 1310, 18 L.Ed.2d 333 (1967), and only denied the certiorari petition following Rees's death by natural causes in 1995. *See Rees v. Superintendent of Virginia State Penitentiary,* 516 U.S. 802, 116 S.Ct. 271, 133 L.Ed.2d 10 (1995); *see also Smith v. Armontrout,* 812 F.2d 1050, 1056 n. 7 (1987); *Rumbaugh v. Procunier,* 753 F.2d 395, 398 n. 1 (5th Cir. 1985). Rees was held at the Federal Medical Center in Springfield, Missouri, following remand, until his death. *See* Stuart Minor Benjamin, *Stepping into the Same River Twice: Rapidly Changing Facts and the Appellate Process,* 78 TEX. L.R. 269, 330 n. 217 (1999).

Furthermore, we think it very probable, given the circumstances that perforce accompany a sentence of death, that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect. Yet, *Rees* clearly contemplates that competent waivers are possible, *see also Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), and there is little point in conducting a competency inquiry if a finding of incompetency is virtually a foregone conclusion.

812 F.2d at 1057.

The *Smith* court also rejected the petitioners' contention that "the [d]istrict [c]ourt erred by construing *Rees*'s requirement that Smith have the capacity to appreciate his position and to make a rational choice to require only that he be cognizant of his factual circumstances, and that his choice be logical, the product of reason" without determining whether Smith was reasoning from premises or values that were "within the pale of those which our society accepts as rational 'because' [l]ogic employed in the service of irrational premises does not produce a rational decision." *Id.* The Eighth Circuit noted that the district court "examined the rationality of the values and beliefs underlying Smith's decision, including his aversion [to] confinement, and his conclusion that ... he [would] be unable to avoid a life sentence" and affirmed the district court's conclusion that Smith's decision to forego further legal review was competent. *Id.* at 1058, 1059.

Similarly, in *Franklin v. Francis,* the court rejected a construction of the *Rees* standard that first required an inquiry into the capacity of the inmate to make the waiver decision, and then, if the inmate was found to have the capacity, to require

an inquiry whether the inmate was "suffering from a mental disease, disorder, or defect which may substantially affect that capacity." 144 F.3d 429, 433 (6th Cir.1998)(quoting *Rees,* 384 U.S. at 313, 86 S.Ct. 1505). The Sixth Circuit concluded that *Rees* was stated in the alternative rather than the conjunctive: "[e]ither the condemned has the ability to make a rational choice with respect to proceeding *or* he does not have the capacity to waive his rights as a result of his mental disorder." *Id.* (citing *Demosthenes v. Baal,* 495 U.S. 731, 734, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Whitmore,* 495 U.S. at 165, 110 S.Ct. 1717). The Sixth Circuit found the "best explanation of the *Rees* test" in *Smith v. Armontrout,* 812 F.2d 1050 (8th Cir.1987), and held that because competency hearings are contemplated "incompetency is [not] a foregone conclusion." 144 F.3d at 433 (quoting *Smith,* 812 F.2d at 1057); *see also Lonchar v. Zant,* 978 F.2d 637 (11th Cir.1992); *Rumbaugh v. Procunier,* 753 F.2d 395 (5th Cir.1985).

Further, with respect to application of the *Rees* standard, many courts have simplified the inquiry by requiring a three-part analysis:

(1) Is the person suffering from a mental disease or defect?

(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in

the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

*Rumbaugh v. Procunier,* 753 F.2d 395, 398–99 (5th Cir.1985)(footnote omitted); *accord Lonchar,* 978 F.2d at 641–42; *Ford v. Haley,* 195 F.3d 603, 615 (11th Cir.1999).

Likewise, in *Mason v. Vasquez,* 1993 WL 204625, *3 (N.D.Cal.1993), the district court utilized *Rumbaugh*'s three part inquiry in determining whether a condemned inmate was competent to waive further legal review. Although not specifically addressing the district court's application of *Rumbaugh*'s three-part inquiry, the Ninth Circuit affirmed the district court's analysis, finding the inmate competent and concluding that the third-party petitioner lacked next friend standing.[40] *See Mason v. Vasquez,* 5 F.3d 1220, 1224 (9th Cir. 1993), *aff'd vacatur of stay,* 1 F.3d 964 (9th Cir.1993)(*en banc*), *recalling en banc mandate and remanding,* 5 F.3d 1226 (9th

Cir.1993)(*en banc*). Significantly, the Ninth Circuit also established that the district court's findings of fact are governed by the clearly erroneous standard, and decisions regarding credibility are entitled to great deference. *See Mason,* 5 F.3d at 1224.

This Court concludes that the three-part inquiry set forth in *Rumbaugh* as applied in *Mason* provides an appropriate framework for assessing Mr. Comer's competency to waive further legal review of his conviction and sentence.

With respect to the allocation of the burden of proof, the Ninth Circuit has held that:

> Initially sufficient evidence must be presented to cause the court to conduct an inquiry. After that point, it is no one's burden to sustain, rather it is for the court to determine by a preponderance of the evidence whether the petitioner is mentally competent to withdraw his petition.

*Mason,* 5 F.3d at 1225.[41]

Finally, the Ninth Circuit in this case determined before remanding it to this

---

**40.** The majority of the Ninth Circuit endorsed the district court's application of the following standard to determine competency:

> [W]hether [the petitioner] has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Mason v. Vasquez,* 5 F.3d at 1224 (citing *Rees,* 384 U.S. at 314, 86 S.Ct. 1505).

**41.** Although the district court expressly determined that the third-party petitioner bore the burden of proving incompetence and implicitly found that the petitioner had failed to meet his burden, the three-judge panel affirmed the district court's finding that the petitioner was competent, *see id.,* 5 F.3d 1220 (1993), and a majority of the Ninth Circuit special death penalty *en banc* court affirmed. *See id.,* 1

F.3d 964 (9th Cir.1993) (*en banc*). The petitioner was executed shortly thereafter. Approximately a month later, the *en banc* court recalled its mandate and remanded the cause to the panel. *See id.* at 1226. Judges Pregerson and Noonan dissented contending that the case should have been remanded to the district court to properly allocate the burden of proof enunciated by the panel. The two dissenting judges maintained that, "[b]y concluding that no one had the burden of proving David Mason's competency, the three-judge panel necessarily determined that the district court erred in stating that the burden of proof was on Attorney Marson .... This being the case, the three-judge panel should have remanded this matter to the district court to determine David Mason's competency by applying the burden of proof enunciated by the three-judge panel—viz. whether Mason, by a preponderance of the evidence, was mentally competent to withdraw his petition and to waive his appeals." *Id.* at 1228. Judge Pre-

Court, that a presumption of competency does not apply to Mr. Comer. In accordance with *Mason,* this Court concludes that no party bears the burden of proof.[42] Instead, the question is whether, giving full and fair consideration to all of the evidence, does it establish by a preponderance that Mr. Comer is competent to dismiss his habeas counsel and waive further legal review of his convictions and sentences. Adhering to this standard, the Court finds after a thorough review of all the evidence presented that Mr. Comer is competent to dismiss his habeas counsel and waive further review of his convictions and sentences.

### A.  Mental Disease or Defect

Pursuant to *Rumbaugh,* 753 F.2d at 398–99, the first inquiry is whether Mr. Comer is suffering from a mental disease or defect. Habeas counsel maintains that Mr. Comer suffers from depression, PTSD, and SHU syndrome. Mr. Comer, special counsel and Respondents disagree. The Court finds that Mr. Comer is not suffering from any mental disease or defect, or SHU syndrome. This determination is based primarily on the evaluations, reports, and testimony of the psychiatrists, Dr. Johnson and Dr. Kupers, the report of the psychologist Dr. Landis, and the testimony, writings, and background of Mr. Comer, but is also based on other witness testimony and all the exhibits admitted.

Rule 702 of the Federal Rules of Evidence, which codified the principles of *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), sets forth the requirements for the admissibility of expert testimony. No party specifically objected to the admissibility of the testimony of either psychiatrist based upon Rule 702. Thus, the Court admitted and considered all of the psychiatric testimony, but the Court finds the application of the principles of Rule 702 helpful in evaluating the reliability of the opinions of the two psychiatric experts, and their credibility.

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as a expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court clarified that these principles also apply to technical and other specialized knowledge, including psychiatric testimony. *See S.M. v. J.K.,* 262 F.3d 914, 921 (9th Cir.2001). The Supreme Court in *Daubert* provided trial courts guidance relevant to determining reliability which the Court finds useful in this case:

---

gerson argued that by improperly allocating the burden of proof to determine Mason's competency, the district court had placed more weight on the deficiencies in Marson's proof establishing incompetency than on the government's proof establishing competency which required a remand to the district court. *See id.*

**42.** The issue regarding who had the burden of proof and of going forward was not definitively determined prior to the hearing. (R.T. 3/28/02 at 928–30.) The Court gave equal and fair consideration to all the evidence presented by all the parties, who appeared throughout the proceedings to assume the burden and aggressively acquire and present the evidence in support of their respective positions.

[T]he word "knowledge" connotes more than subjective belief or unsupported speculation.... [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. In *Kumho,* the Supreme Court went further in defining the standard of reliability holding that the standard:

requires a valid ... connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the [relevant] discipline.

526 U.S. at 149, 119 S.Ct. 1167; *General Elec. Co. v. Joiner,* 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)(the evidence must be excluded if the court finds "that there is simply too great an *analytical gap* between the data and the proffered opinion") (emphasis added); *see Joy v. Bell Helicopter Textron,* 999 F.2d 549 (D.C.Cir.1993)(expert testimony based upon speculative assumptions is inadmissible); *Jinro America Inc. v. Secure Inv., Inc.,* 266 F.3d 993 (9th Cir.2001) (*"impressionistic generalizations"* were held inadmissible)(emphasis added).

Dr. Kupers is qualified to render opinions on the issues before this Court, but Dr. Johnson for a number of reasons is significantly more qualified to render the competency opinion, with due respect accorded to Dr. Kupers's special expertise regarding the SHU syndrome. First, Dr. Kupers has never worked inside a correctional setting, is not primarily a forensic psychiatrist, and has no incarcerated patients. (R.T. 3/26/02 at 132–33.) In quantifying his practice, he said "number one is private practice; number two is teaching; and number three is consulting in public mental health and correctional settings as a trainer and a seminar conductor or giving lectures. And then a small part of my work is forensic work within the jail and prison setting." (R.T. 3/26/02 at 197.) Also, Dr. Kupers has never engaged in "a forensic evaluation to determine the competency of an inmate to be executed," nor has he "ever [previously] had an occasion to do a forensic evaluation of an inmate sentenced to death who wants to dismiss his appeal." (*Id.* at 133.) In contrast, all of Dr. Johnson's patient evaluations are of persons who are incarcerated, and several of them currently face capital sentences. (R.T. 3/28/02 at 735–38.) She is also a board certified forensic psychiatrist, and her work is focused on competency evaluations.[43] (*Id.* at 733–34, 735.) Second, Dr. Johnson's investigation and preparation for her opinion and report were more thorough than that of Dr. Kupers and the methods she employed to reach her decision were more reliable than Dr. Kupers's. She spent at least fifty hours,[44] by her count fifty-two and one-half hours, begin-

---

**43.** *See* Curriculum vitae of Dr. Johnson attached to Dkt. 162.

**44.** At one point, habeas counsel asked the ADOC visitation officer, Sergeant Hackney, whether she knew of any limitations imposed on Dr. Kupers in evaluating Mr. Comer (she

did not). (R.T. 3/27/02 at 559, 595.) In response to a subsequent Court inquiry, habeas counsel acknowledged that Dr. Kupers felt that "his evaluation was very complete and thorough" and that he had not required more time than authorized to evaluate Mr. Comer. (*Id.* at 626.)

ning in April 2001 and ending on March 25, 2002, personally interviewing and evaluating Mr. Comer, including eight hours the day before Mr. Comer testified; and before she testified and rendered her final opinion at the hearing on March 28, 2002, she was present and observed Mr. Comer testify on March 27 and 28, 2002. (R.T. 3/28/02 at 745–48, 915.) In contrast, Dr. Kupers spent perhaps twenty hours with Mr. Comer, which included some phone conversations rather than in-person interviews, all of which occurred during portions of two days in November 2001 and two days in January 2002. (R.T. 3/26/02 at 19, 165.) According to Mr. Comer, Dr. Kupers left early during two of the four interviews. Mr. Comer testified that at "the last one he kept looking at his watch, so I told him, why don't you just go? And he left. He was worried about whether he was gonna make his next flight." [45] (R.T. 3/27/02 at 662–63.) Further, Dr. Johnson told the Court that the "crux" of her "diagnostic opinion" was based upon the

> series of in depth, broad range, and comprehensive sessions with Mr. Comer revealing his life, his mental status, observing and assessing his ability to process information, looking at his mood and his—the modulation of his mood in response to various situations that arose, looking for consistency and symptoms or behaviors over time.

(*Id.* at 741.)

Additionally, the breadth of Dr. Johnson's investigation is demonstrated by her personal interviews of "a number of people directly who would have had the short and long-term opportunity to review Mr. Comer's mental status" to learn of their independent "behavioral observations" of him, and "conversations and interactions" with him, and she interviewed Amy Young, the woman with whom Mr. Comer developed and maintained a very close relationship for nine years. (R.T. 3/28/02 at 741–42, 743.) Dr. Kupers merely "talked with staff as [he] conducted [his] tours and interviews," and though he attempted to do so, he did not interview Ms. Young. (R.T. 3/26/02 at 17.) Also, Mr. Comer carefully reviewed Dr. Kupers's report and made thirty-three pages of comments including noting a number of factual errors and improper inferences made by Dr. Kupers.[46] (R.T. 3/27/02 at 381–90.) In contrast, Mr. Comer made very few corrections of Dr. Johnson's report. (*Id.*) Finally and significantly, Dr. Kupers failed to ask Mr. Comer questions critical to a determination of whether his decision was voluntary and competent such as "why [Mr. Comer] was withdrawing his appeals" and whether Mr. Comer had "thought about changing [his] mind since [he] first filed [his] motion to withdraw the appeals." On rebuttal Dr. Kupers claimed for a variety of unpersuasive reasons that it was not necessary to ask him these direct questions. (*Id.* at 388; Dep. R.T. at 20–21.) By comparison, Dr. Johnson asked all these questions of Mr. Comer "a whole lot." (*Id.*)

The Court finds that Dr. Johnson's opinions were "supported by appropriate validation—*i.e.,* 'good grounds' based on what

---

**45.** Sergeant Hackney, the visitation officer for SMU II at relevant times, testified that Dr. Kupers spent 14.25 hours in SMU II, a portion of which was spent touring the facility rather than face-to-face interviews of Mr. Comer. (R.T. 3/27/02 at 556, 559–60.)

**46.** At some point, Mr. Comer stopped correcting the errors because it was so time consuming. With respect to one of the errors, he testified, "I just was helping him out because, like, the sentencing to death row was in April. I didn't know if I was supposed to be that thorough with it or not." (R.T. 3/27/02 at 382.) Concerning the improper inferences drawn by Dr. Kupers, Mr. Comer testified "[T]hat's what he's got to say about it. That's not—that's not the way I'm talking about anything. That's all—that's something from his mind ... his persona." (*Id.* at 385–86.)

is known." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.

### 1. Depression

Dr. Kupers found Mr. Comer suffers from a "Major Depressive Disorder, severe and recurrent with alternating periods of psychomotor agitation and psychomotor retardation." (R.T. 3/26/02 at 20.) Dr. Johnson disagreed, and the Court finds the credible and reliable facts support, and are consistent with, Dr. Johnson's judgment.

Dr. Kupers began his testimony on depression by explaining that his opinion and his current diagnosis is that Mr. Comer suffers "Major Depressive Disorder" which Dr. Kupers based upon the diagnostic criteria for this disorder identified in the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV) ("DSM–IV") which "has a format for diagnosing depression." (*Id.* at 20–21.) He then drifts into a discussion of a "depressive episode" explaining that the DSM–IV defines a "depressive disorder" as "someone who has two or more depressive episodes" and he then offers the undifferentiated opinion that "Mr. Comer indeed had two very serious depressive episodes, probably more, and probably is very depressed in between episodes," and that he "fit all of [the] characteristics" for this disorder. (R.T. 3/26/02 at 21.)(Emphasis added.)

The DSM–IV identifies a "Major Depressive Episode" as within the category of "Mood Episodes," but characterizes a "Major Depressive Disorder" as within a separate group of the DSM–IV titled "Depressive Disorders." DSM–IV at 318, 320, 339. Dr. Kupers is correct that the two disorders clearly overlap in that a "Major Depressive Disorder" does include the condition of a "depressive episode," and the integral definition of a "Major Depressive Disorder," is as follows: the *"essential feature* of a Major Depressive Disorder is a *clinical course* that is *characterized* by one or more Major Depressive Episodes." [47] DSM–IV at 339 (emphasis added). The DSM–IV also expressly provides, however, that a reliable diagnosis of Major Depressive Disorder requires deductively excluding alternative explanations for the symptoms and that: "General Medical Condition [does] *not* count toward a diagnosis of Major Depressive Disorder." [48] DSM–IV at 339. (emphasis added.) Concomitantly, in a comparable section under the heading "Differential Diagnosis," the DSM–IV states that "Major Depressive Episodes in Major Depressive Disorder must be distinguished from **Mood Disorder Due to a General Medical Condition.**" *Id.* at 343. During his direct testimony, Dr. Kupers rendered his opinion without distinguishing, excluding or dismissing any possible alternative diagnoses, including a medical condition, before firmly concluding that Mr. Comer was afflicted with a major depressive disorder.

Dr. Kupers identified what he claimed was the first of two depressive episodes experienced by Mr. Comer as occurring in May 1999 when Robert Vickers died. (R.T. 3/26/02 at 22.) The DSM–IV, which Dr. Kupers relied on, sets forth the crite-

---

47. The essential feature of the Major Depressive Episode is described as "a period of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities." *Id.* at 320.

48. The term general medical condition refers to "conditions and disorders that are listed outside the 'Mental and Behavioral Disorders'

chapter of [the International Classification of Diseases]." DSM–IV at XXV. The criteria for a mental disorder due to a general medical condition is that "[t]here is evidence from the history, physical examination, or laboratory findings that the disturbance is the direct physiological consequence of a general medical condition." *Id.* at 7.

ria for a "Major Depressive Episode" as requiring the presence of "[f]ive (or more) of [identified symptoms] during the same 2–week period and represent a change from previous functioning . . . ." DSM–IV at 327. Significantly, neither in his testimony nor in his report did Dr. Kupers find at least five of the identified symptoms as being experienced by Mr. Comer over the two-week period following Mr. Vickers's death. Instead, Dr. Kupers's report cited Mr. Comer's comments that after the death of his friend:

> [h]e had no interest in anything. He had no pleasure in anything. He spent most of the time in his bunk. Contrary to his usual pattern of walking 14 to 20 hours a day in his cell in any recreation area, he didn't walk much at all. He expressed great sadness and he was in deep depression.

(R.T. 3/26/02 at 22.) This description of Mr. Comer's emotional condition after his friend's death does fit two of the criteria in the DSM–IV, that is, he had a(1) "depressed mood most of the day . . ." and a(2) "markedly diminished interest or pleasure in all, or almost all, activities most of the day . . ." DSM–IV at 327. However, Dr. Kupers did not testify that Mr. Comer complained that he also experienced any of the remaining symptoms identified in the DSM–IV for a major depressive episode which are, (3) significant weight loss, (4) insomnia or hypersomnia,[49] (5) psychomotor agitation or retardation, (6) fatigue or loss of energy nearly every day, (7) feelings of worthlessness or excessive inappropriate guilt, (8) diminished ability to think or concentrate, or indecisiveness, or (9) recurrent thoughts of death. *Id.* Hence, Dr. Kupers's testimony describing Mr.

Comer's symptoms following Mr. Vickers's death do not establish a major depressive episode pursuant to the DSM–IV.

Dr. Johnson's perception of this period of time in Mr. Comer's life as bereavement or grieving rather than a "depressive episode" is more reliable than Dr. Kupers's. She concluded that Mr. Comer,

> clearly experienced the significant effects of the bereavement or grieving. There were no pathological effects that I was able to identify in going through that period quite consistently with him. The period of time did last, in his account, for a couple of months, he was able to come out of it, and he still has good memories of that relationship and sadness about his friend's death . . . When you look at a grieving process, you have to look at it with the individual and in their culture and what is normal for them in that situation, and to look as to whether there's anything abnormal about what happens to them during that period of time, and there wasn't. He was sad, had some crying and loss of energy in things that you would expect during that, thinking about it, and wondering if he could have done more or what he could do about the situation, looking at the impact it had on him. But all of those are still within the parameter of a normal grief reaction or normal period of bereavement, so that's how I would call that period of time, not depression.

(R.T. 3/28/02 at 788.)

Moreover, bereavement is mentioned in the DSM–IV as a possible differential diagnosis for a "Major Depressive Episode."

---

49. Dr. Kupers stated during cross-examination that although he never mentioned it in his report or prior testimony, Mr. Comer had "problems sleeping" because "most prisoners in that situation" have sleeping problems.

(R.T. 3/26/02 at 217.) This conclusion is nothing more than a generalization without a known source, reason or analysis for extending it to Mr. Comer in particular.

Even if depressive symptoms are of sufficient duration and number in the criteria for a Major Depressive Episode, they should be attributed to *Bereavement* rather than to a Major Depressive Episode, unless they persist for more than 2 months or include marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, psychotic symptoms, or psychomotor retardation.

DSM–IV at 326. Neither in his report nor his testimony did Dr. Kupers attempt to distinguish the differential diagnosis of bereavement from the symptoms he attributed to a major depressive episode until questioned on cross-examination and during his rebuttal testimony. (R.T. 3/26/02 at 22; Dep. R.T. at 50–52.) On cross-examination Dr. Kupers attempted to bolster his opinion by emphasizing that Mr. Comer's symptoms seemed to have occurred for more than two months after the death, but he agreed with Dr. Johnson that the length of time is not "absolute" and that the circumstances that warrant a diagnosis of a depressive episode is a matter of "clinical judgment involved on a case-by-case basis." (R.T. 3/26/02 at 216; Dep. R.T. at 91.)

Finally and crucial to this Court's determination of whether Mr. Comer has a psychiatric illness, including major depressive disorder, is that when he testified no characteristics surfaced that might suggest that he had not recovered from the loss of his friend. Instead, his testimony was credibly consistent with Dr. Johnson's judgment that he felt grief following Mr. Vickers's death. (R.T. 3/27/02 at 435.)

Dr. Kupers's identification of Mr. Comer's purported second major depressive episode fares no better than the first. Dr. Kupers claims this episode began in the spring of 2001 and lasted until November of 2001, when Mr. Comer lost 30 to 40 pounds. (R.T. 3/26/02 at 22.) Dr. Kupers testified that during this time Mr. Comer "spent most of this time in bed. He was unable to get out of bed for most of the time. He was not interested in anything. He cutoff contact with the outside world. He stopped reading the newspaper. He became uninterested in living." *Id.* Although Dr. Kupers cited the existence of five of the DSM–IV's criteria for the diagnosis of major depressive episode, DSM–IV at 327, he did not consider or reconcile his diagnosis of depression with the material facts that could otherwise explain Mr. Comer's weight loss at that particular time.

The evidence established that Mr. Comer voluntarily decided not to eat the meals provided him by the prison during that period for a combination of reasons. He was not pleased with the discipline imposed upon him for major infractions of prison rules, and he is a vegetarian. (R.T. 3/27/02 at 402–405.) His loss of commissary privileges as a sanction aggravated Mr. Comer because as a vegetarian he supplemented his diet with commissary items. As a consequence, Mr. Comer chose not to eat *any* portion of the meal trays provided by the prison, including the non-meat items. Further, this Court did not yield to Mr. Comer's threat that he would starve himself if the prison did not make an exception to its vegetarian meal policy (or rescind its sanction.) Eventually after the sanction expired, Mr. Comer began eating again and devouring his favorite commissary items. His weight was completely regained. (R.T. 3/27/02 at 405–406.) *See* discussion *supra* at §§ B pp. 11–14 in this Order.

In this instance the differential diagnosis of a general medical condition applies. For example, the disorder of anorexia nervosa, defined as the refusal to eat because of a fear of gaining weight, is a differential diagnosis to a major depressive disorder.

**1044**

DSM–IV at 539. Individuals with anorexia nervosa manifest depressive symptoms such as depressed mood, social withdrawal, irritability, insomnia, and diminished interest in sex. Such individuals may have symptomatic presentations that meet criteria for Major Depressive Disorder. **"Because these features are also observed in individuals without anorexia nervosa who are undergoing starvation, many of the depressive features may be secondary to the physiological sequella**[50] **of semistarvation."** DSM–IV at 541.

Mr. Comer did not suffer from anorexia nervosa, but he did manifest depressive features of semistarvation during this period when he voluntarily chose not to eat. Thus, his physical and mental condition mimicked depression, but he was not experiencing a major depressive episode as defined in the DSM–IV.

During his rebuttal testimony, however, Dr. Kupers dismissed the possibility that Mr. Comer's symptoms could be explained by inadequate nourishment. He testified that failure to receive proper food intake does not "explain the laying in bed for long periods, the tiredness, the slowing down, which is psychomotor retardation, [and] the lack of interest in anything." (Dep. R.T. at 51–52.) Dr. Kupers's opinion is completely at odds with the very manual that he cites to sustain his opinion. (Dep. R.T. at 52.)

Dr. Johnson's explanation for Mr. Comer's weight loss during this period is credible, taken in conjunction with the relevant events occurring at this particular time and Mr. Comer's testimony. Consistent with the DSM–IV, Dr. Johnson testified that if the symptoms of depression are caused by a "physical reason," it is not a "major depressive disorder." (R.T. 3/28/02

at 765) DSM–IV at 327 stating, **"Note:** Do not include symptoms that are clearly due to a general medical condition". She continued,

if the weight loss is caused by intentional dieting, ... or in this case, not eating for, you know, your principles then that would not be a—that wouldn't be a qualifying characteristic [of depression]. The not eating would have to come because ... you're mood was low, you didn't have energy, ... you didn't have an appetite.

(R.T. 3/28/02 at 765.) In other words, symptoms of depression would surface first, and as a consequence energy would be depleted and appetite would diminish or disappear. Here Mr. Comer first freely chose not to eat for an extensive period of time and as a result experienced a loss of energy. He acknowledged having previously engaged in hunger protests, and conceded he lost weight in the Summer and Fall of 2001 because he chose not to eat and explained "this time everybody's got a camera on me." (R.T. 3/27/02 at 402.) Significantly, he added that he had no major weight loss within the last few years except when he lost commissary privileges or engaged in hunger actions as a means of protest. (R.T. 3/27/02 at 406.)

Finally, Dr. Kupers's third, more theoretical conclusion, is that Mr. Comer may be afflicted with depression "during the windows of time" between his "depressive episodes." (R.T. 3/26/02 at 23.) Significantly, his opinion was not confidently asserted. He testified that Mr. Comer **"probably** is very depressed in between episodes." (*Id.* at 21.)(emphasis added.) To sustain his perception, Dr. Kupers claimed that Mr. Comer has experienced:

**50.** Defined by Dr. Johnson during her testimony as "[t]he aftermath or aftereffects or leftover features or the development of a new illness as a result." (R.T. 3/28/02 at 811.) In other words, depressive features can be secondary to the physiological aftermath or aftereffects of semistarvation.

a chronic pattern for the last approximately eight years, seven or eight years, of . . . withdrawing from the world, distancing himself from his experience, becoming numb, becoming basically dead inside, having no interest in anything going on in the world, having anhedonia, which is a major symptom of depression which means deriving no pleasure from activities from anything, really. Isolating himself, cutting himself off from anyone.

(*Id.* at 23.) His conclusion is based on his observations of Mr. Comer during the interview and he testified, "I consistently found . . . that while Mr. Comer said that he was not depressed, as the interview proceeded he became—he slowed down. He exhibited what I call psychomotor retardation. His thoughts, his feelings slowed down. He became noticeably sad." (R.T. 3/26/02 at 25.) He added that he observed Mr. Comer's "posture slumped, he became sad, he teared during our discussion, and it was more than the usual normal range of affect. Rather, he **appeared** to be depressed." (*Id.* at 26) (emphasis added.) Dr. Kupers's theory is unsound for a number of reasons.

First, Dr. Kupers's reliance on the description in the DSM–IV of the "episode features" of a major depressive episode for the "windows of time" when he conceded that Mr. Comer was not experiencing a major depressive episode is erroneous. Simply put, if Mr. Comer is not suffering a major depressive episode, the features for this disorder, absent some authority to the contrary, are irrelevant to whether Mr. Comer is experiencing a *different* type of depression between the purported episodes. It is undisputed in Dr. Kupers's rebuttal testimony, given after reviewing the transcript of Mr. Comer's hearing testimony, that Dr. Kupers did not believe Mr. Comer had "depressive episodes" other than the two discussed above. (*See* Dep. R.T. at 54.) Significantly, he testified

that Mr. Comer "**came out** of his major depressive episode" adding "No. I don't have—I don't have an opinion" that Mr. Comer was in a severe depressive episode at the time Mr. Comer testified at the evidentiary hearing. (emphasis added). Nonetheless, Dr. Kupers, without specific reference to the DSM–IV, or any other authoritative source, persisted in maintaining that Mr. Comer "continued to suffer a depressive disorder." (Dep. R.T. at 54, 57.) Dr. Kupers's opinion is therefore "not supported by appropriate validation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.

Further, the frailty of this diagnosis was demonstrated during Dr. Kupers's rebuttal testimony, which reflected a troubling degree of uncertainty and unpredictability. Dr. Kupers said he reviewed the transcript of Mr. Comer's hearing testimony and opined that Mr. Comer was "still under the influence of depression" when he testified about his "decisions" to waive his right to appeal, though now asserting that Mr. Comer's depression "could be a lesser level of depression" than those identified as previous periods of depression. (Dep. R.T. at 58, 60–61.) Then completely undermining this opinion, he said he could not identify the symptoms of depression he observed during Mr. Comer's testimony because he did not see him testify. Significantly he added that he "wouldn't offer an interpretation of symptoms from a transcript" and declined to testify about symptomology based on reading a transcript, stating that he "would rather have been there in person or view a video." (Dep. R.T. at 87–88.) His opinion was further discredited when after testifying that "he would not offer an interpretation of symptoms from a transcript," he offered such an opinion, testifying "[o]h, I don't think his symptoms have disappeared, no. I just don't think he's expressing psychomotor retardation **at the moment.**" (Dep. R.T. at 87)(emphasis added.) This new opinion, however, represents a complete change of position, with-

out explanation, from the opinion given only seven days before that "psychomotor retardation" was a feature he observed in Mr. Comer and that strongly influenced his opinion that Mr. Comer had depression. (R.T. 3/26/02 at 25–26.) Dr. Kupers's conclusion that Mr. Comer continued to suffer depression, based only on his review of the transcript, together with his failure to identify any facet of Mr. Comer's testimony to support this conclusion, renders it highly dubious.

In a further attempt to explain away Mr. Comer's coherent and rational testimony, Dr. Kupers made his primary focus during rebuttal his emphatic view that Mr. Comer was feigning mental health by behaving "very rational[ly] and methodical[ly]" to convince the Court that he does not have a mental disorder. Dr. Kupers offered an apocryphal analogy of a suicidal patient hospitalized for depression who behaves and responds to treating staff with the goal "to convince the psychiatrists to let him out so he can go out and kill himself." (Dep. R.T. at 19; *see also* R.T. 3/26/02 at 98–99.) The deficiency in this analogy is that it fails to take into account the substantial differences in the environments of a mental hospital and a prison. In a hospital, the patients are under constant supervision to insure they do not commit suicide, but in a prison, inmates are not watched to prevent attempted suicide unless staff have some reason to suspect an inmate will attempt it.

Mr. Comer has never been placed on suicide watch. Moreover, Dr. Kupers acknowledged that Mr. Comer could have accomplished suicide in prison at any time during the almost twenty years he has been incarcerated. When asked whether he was familiar with the term "suicide by cop," Dr. Kupers answered "yes" and explained that it was part of the prison code of male inmates who "don't commit suicide. People who commit suicide are weaklings.

So the tough way out, and also a way to harm your loved ones less, is to get into some kind of altercation with an officer and get shot and killed." (R.T. 3/26/02 at 250.) It is undisputed that Dr. Kupers believes Mr. Comer ascribes to, and lives by, this prison code, describing him as "a stand-up con ... [who] has the respect of the other prisoners" and who is "a tough enough guy" that he is now working on walking away from a fight. (R.T. 3/26/02 at 187–88.) Responding to Dr. Kupers's opinion that Mr. Comer was attempting to commit a form of "suicide by cop" by waiving his appeal, Mr. Comer testified that,

> How hard is it to make yourself—I mean, hell, you's guys saw the—the toilet paper noose on TV. I know how to do that. I didn't make that one, but I know how to do it. God, it's the easiest thing to do. They—I remember [Dr. Kupers] talked about suicide by cop. Hell, there's a lot of officers back there [referring to the officers in the courtroom and the U.S. Marshals in the court house jail]. Can go back, commit suicide with them.

(R.T. 3/27/02 at 442.) More elegantly put, and to the point, Dr. Johnson testified,

> I think he, if he was suicidal, he could clearly kill himself. I don't know whether he would choose to stab himself, but he could do that. But he could have obtained drugs or medication or hung himself or suffocated himself, drugged himself, any number of things. Or he could have gotten somebody to kill him if he didn't want to do it himself. **I mean, so if he was actively suicidal over these years, he has had ample opportunity and continues to have ample opportunity to end his life that way.**

(R.T.3/28/02 at 813)( emphasis added.)

Again, Dr. Johnson's judgment that Mr. Comer is not suffering any type of depres-

sion is reliable and supported by credible evidence, including the testimony of Mr. Comer, Warden Marshall, and Sgt. Hackney. After the many hours Dr. Johnson personally spent with Mr. Comer, including the day before he testified and her observation of him during his testimony, she persisted in her opinion that "he is not clinically depressed." (R.T. 3/28/02 at 777.) She also relied on the DSM–IV and "reviewed all of" the criteria with Mr. Comer "and more in the areas of depression" and firmly disagreed that Mr. Comer was denying his symptoms of depression. She explained that the proper evaluation method is "to look for a set of symptoms, most classically those include neurovegetative signs, which have to do with sleep and appetite and concentration and a variety of things, all spelled out in our classification system." (R.T. 3/26/02 at 767.) She continued that a person may "adamantly deny they're depressed" but if they are depressed there still is "the presentation of depression" from the "signs and symptoms" of the diagnosis, but Mr. Comer never displayed these symptoms during her visits with him nor during his testimony in court. (R.T. 3/28/02 at 767–68.)

The only meaningful evidence that might suggest Mr. Comer suffered from depression are his prolific writings in the nature of correspondence and declarations. Taken in isolation, the content of his writings is enigmatic if not troubling because some can be interpreted as expressing unhappiness, despair, and perhaps no purpose to continue living. Dr. Johnson's analysis and interpretation of these writings, however, is correct. Mr. Comer is very intelligent and an avid communicator both orally and in writing.[51] The Court finds that writing for Mr. Comer is, just as journaling is for some people, a method he uses to effectively cope with feelings. He also uses it to get attention, and as the Court observed, as a manipulative tool. Dr. Johnson explained:

he has a question, or he's frustrated, or he's aggravated, he writes. And he writes his feelings out pretty clearly. And sometimes you have to sit down with him, which is what I try to do with all his writings, and go through them over time and look at the evolution ... And I think if you take them in that context and look at his feeling, he didn't know where to go at the beginning, and his own experience that if you are **kind of flashy and bold in your writing, to put it politely, you get people's attention**. And that's worked for him before. It works for him verbally.... If he needs some attention right now, he doesn't sit back and necessarily explain that to you in the most considered way, you now. It comes out and it gets somebody's attention. And then he likes the opportunity to explain.

(R.T. 3/28/02 at 756–57)(emphasis added.) Considering them cumulatively, they are, as described by Dr. Johnson,

not irrational ... [they] demonstrate that he does have an in-depth understanding, particularly his writing in regard to reviewing the different parts of his whole year of activity that has gone on.... It's very organized, it's very to the point. It's reflective, has original thought in it, and expresses an interface

**51.** Mr. Comer's skills were demonstrated during his testimony when he spoke without hesitation, and though sometimes using the foreign idiom "joint talk," *i.e.*, prison slang, *see* R.T. 3/27/02 at 336–338, he also used more sophisticated language than one would expect from someone with a high school education, who had been incarcerated for most of his adult life, *e.g.*, "construed," "persona," "nuances," "mitigate," "circumvent," "compelled," "equate," "abating," etc. (R.T. 3/27/02 at 409, 414, 711, 386, 446, 452, 481.)

with this process [the litigation] that's going on.

(R.T. 3/28/02 at 761.)

An excellent example of the validity of this interpretation is the explanation Mr. Comer gave the Court for the letters he wrote to the Ninth Circuit, precipitating the remand to this Court. The Court explained to Mr. Comer that the Ninth Circuit was concerned about his state of mind when in his letters, he claimed he never appealed but the record established that he signed documentation representing his intention to appeal. (R.T. 3/27/02 at 716–18.) Mr. Comer first insightfully explained,

> [I]f we did this all over, started today and started all over, with everything I've been taught this last couple of years, I would not have done something like that. You see how I've evolved to that? When I tell you that—that I didn't never appeal it, I have never—I'll tell you right now. I have never appealed it. But see, that's joint talk.[52]

(*Id.* at 716–17.) He adds that what he means is that he did not *personally* intend to get involved in his appeal, which this Court finds credible. He stated:

> I didn't want to see Mr. Eckerstrom back in '97. Amy asked me to go see him, I went and seen him. I thought about it, okay, I'll go see him. So whatever I signed for them, I signed for them. I don't deny signing anything. I don't deny that we ever had an attorney visit. I don't deny that I signed paperwork that said continue with my appeals. I don't deny any of that. I am just telling you I, in my heart, have not

appealed this. I never appealed any of this.

(R.T. 3/28/02 at 717.)

Mr. Comer's use of troubling terminology in his letter to the Ninth Circuit such as "conspiracy" and "ZOG" is a very good example of his use of "flashy and bold" expressions to get attention. He explained that "ZOG" is used in prison to apply to something you do not agree with. He stated, "[I]f the Republican Party is something you don't agree with, in prison you can call it the ZOG."[53] (R.T. 3/28/02 at 719–20.) He continued by explaining his frustration because he was unable to get assistance to withdraw his appeal and "to decide what to do with [his] life." Thus, when he used the word "conspiracy" he "felt [that various people] were working together against [him]" and "interfering with what [he] thought was [his] right" to control his life. (R.T. 3/28/02 at 720–23.) The use of this terminology is not the product of a delusional mind, but was Mr. Comer's unsophisticated way of trying to get noticed, which was effective, but also conveyed an unintended meaning.

This Court was also a recipient of one of Mr. Comer's bold and flashy letters designed to capture the Court's interest. On or about October 24, 2001, Mr. Comer wrote an angry letter to the Court emphatically expressing his views on his diet, and ADOC's failure to meet his demands for vegetarian meals. Significantly, and in character for Mr. Comer, he included a threat to gain the attention of everyone. He stated: "Everybody listen up real good now and pay attention, so the second half of this evaluation can proceed without hitches and not be drawn out over the next

---

52. Mr. Comer has also recognized that there is a downside to his abundant spontaneous utterances or "running his mouth;" "he gets his feelings out" and "then he feels better, but he has already mailed the letter." (*Id.* at 360, 716–17, 756–57.)

53. Mr. Comer did not fail to mention that the ZOG is also prison slang for the Zionist Occupational Government which is "racist." (R.T. 3/28/02 at 719.)

10 years!" (Tr. Ex. 24.) He then details all the improprieties he has experienced with ADOC and concludes this portion of his letter with the warning that he "will live off ONLY inmate store until my execution date." (*Id.*) He continues, "[s]o if I become not competent because of all the bullshit ADOC has put me through, oh well!" (*Id.*) He finishes with the distinct and forceful promise not to back down, or give up "working to pull [his] appeal, if it takes 3 more months or 20 years." (*Id.*)

The words and terminology used in this letter are not the expressions of a man who intends to commit suicide because he suffers a mental disorder. They are the language used by a man with a strong will and strong ego who wants as much control of his life as possible within the realities of a prison setting, and who will demand control using threats when his inclinations

are challenged. The letter reinforces the view that he is expressing an intention to pursue execution, not suicide, and execution was, and is, his choice and plan, which he will persistently pursue for as long as he is incarcerated, with or without the help of anyone, including ADOC, whose alliance he questions in the letter.[54]

Dr. Johnson's explanation of the significance of Mr. Comer's letter writing and his purpose in doing so was depicted during his testimony when he strongly reaffirmed his conviction to continue seeking to fulfill his choice to waive his appeal.

Further the Court credits Dr. Johnson's opinion that Mr. Comer does not have depression because she witnessed the testimony of Mr. Comer and because her opinion embodies the Court's perception of Mr. Comer, acquired over the two years of the Court's contact with him, including

---

**54.** It is noteworthy that Mr. Comer expresses in this letter empathy and compassion for his habeas counsel who took his part on the ADOC diet controversy. Concomitantly, the letters from habeas counsel to Mr. Comer show sympathy for his failure to get his deserved results from the Court and ADOC. This, however, is the same habeas counsel Mr. Comer chided, threatened, and made very offensive comments about in many of his other writings because they would not submit to his decision to waive his appeals, and allow him to make that choice.

This letter and others he wrote to habeas counsel after his reluctant agreement to speak with them during the evaluation process, demonstrate that he can be manipulative and has used his writings to accomplish his objectives. The Court finds that in these letters Mr. Comer strategically does his best to mollify habeas counsel with an explanation which might draw their sympathy and persuade them to withdraw their opposition and accept his decision. When, however, he felt vindicated by the Court's ruling in his favor his expression of antipathy for habeas counsel returned. Recently, after this Court issued the order in favor of Mr. Comer he in no uncertain terms told habeas counsel "YOU'RE FIRED," admonishing them not to "interfere with [his] case when it goes back

before the 9th circuit." (Dkt. 436; *see* n. 54, *infra.*)

On about July 21, 2001 the Court received a letter/declaration from Mr. Comer of the same vintage. In this letter, Mr. Comer strenuously protested the Court's decision to discontinue his contact visits with special counsel because he would not disclose the whereabouts of the metal he cut from his desk. *See supra* 11–14. Again his complaints were straight forward, passionate, bold and flashy. Without the diplomatic flair one might expect of a literary scholar or a seasoned politician, he makes his point by making offensive, derogatory and defamatory characterizations of everyone involved in this litigation. The letter, however, is just another example of Mr. Comer's expression of anger and frustration when something has not gone his way, and his use of an energetic, albeit sometimes crude writing style to get noticed and to make sure that everyone understands his point of view. The letter does not in any manner demonstrate indicia of depression. Rather, it conveys that Mr. Comer is a resolute man with the courage to express his opinions his way to anyone and everyone sometimes without considering the long-term consequences. *See supra* n. 51.

four hearings where he appeared in person, by telephone or by video teleconferencing on August 25, 2000, October 19, 2001, January 11, 2002, and March 18, 20, and 26–28, 2002. Mr. Comer was alert and an active participant in the competency hearing. He keenly concentrated on the questions posed to him and he answered them cogently. His testimony did not communicate sadness, despair, or no purpose in living. He demonstrated the full range of normal human emotions throughout the proceedings and hearing,[55] including sadness, happiness, anger, frustration, and humor.[56] (R.T. 3/28/02 at 710–11.) In fact, Dr. Kupers readily admitted during his rebuttal testimony that Mr. Comer "can do a whole number of things and he is **rational**." (Dep. R.T. at 58.)

Mr. Comer does not suffer the mental disorder of depression.[57]

**55.** This was most clearly reflected by his emotional evolution in his relationship with his habeas counsel. Following remand, Mr. Comer refused to have anything to do with habeas counsel and both threatened and ridiculed them. *See* n. 53, *supra.* Special counsel persuaded Mr. Comer to reinitiate contact with habeas counsel, who were afforded the opportunity to explain the merits of his pending appeal and to attempt to enhance certain aspects of Mr. Comer's confinement and ultimately to attempt to dissuade Mr. Comer from his decision, as was their right. (*See* Chandler, *Voluntary Executions,* 50 Stan. L.R. at 1917 (in one defense attorney's experience, "developing a personal relationship with the client can help to alter even an adamant position in favor of dying"); Harrington, *A Community Divided: Defense Attorneys and the Ethics of Death Row Volunteering,* 25 LAW & SOC. INQUIRY at 863 ("Attorneys agree that their first responsibility [after a client volunteers] is what Dieter calls 'effective persuasion'—vigorously attempting to dissuade the client from actually dropping appeals")). Correspondence from habeas counsel to Mr. Comer offered at the hearing reflected habeas counsel's efforts to strengthen their relationship with Mr. Comer. Their efforts were not without effect. Thus, Mr. Comer noted that only Pete Eckerstrom sent him a Christmas card in December 2001, which by all appearances, genuinely touched Mr. Comer. At the same time, Mr. Comer played on habeas counsels' sympathetic nature in an attempt to get them to understand why he decided to abandon his appeal, and ultimately, to dissuade them from opposing that decision. Thus, in his letter of January 2002, after thanking Pete Eckerstrom for sending him a Christmas card and noting the absence of a realistic possibility of being released or even being moved to a main line cell in light of his disciplinary history, Mr. Comer says:

you guys can't help me. I'm way past helping. You put down a hurt, sick dog. I want to be, to have the same consideration. I know how you feel Peter. I do. I've told you before I am probably more anti-death penalty than you ever will be. If there was any way to make me right, dang Pete, I'd try it! But there isn't. . . .

(Tr. Ex. 25 at 3.) Ultimately, neither Mr. Comer nor habeas counsel were persuaded by the other's efforts.

**56.** His humor was displayed throughout the competency hearing. See his testimony about his marriage, need for glasses, the cattle prod, and his special counsel losing papers. (R.T. 3/27–28/02 at 318, 710, 439, 429, 436, 309, 715.)

**57.** The only credible evidence that Mr. Comer ever experienced a mental disorder while at ADOC SMU II was identified by Dr. Johnson when Mr. Comer reported to her that he had severe anxiety and panic occurring immediately following the emotionally painful interview and evaluation conducted by Dr. Kupers. Certainly it is undisputed that Dr. Kupers never intended to hurt or harm Mr. Comer, but of greater significance for this Court's decision, the symptoms disappeared shortly after they emerged and were not present at the time of his competency hearing. (R.T. 3/28/02 at 769–775.) Further, these symptoms may have been observed by Dr. Kupers during his interview of Mr. Comer leading him to conclude Mr. Comer is "**probably very depressed in between**" the two depressive episodes identified by Dr. Kupers. (R.T. 3/26/02 at 23)(emphasis added.) Mr. Comer's and Dr. Johnson's explanation for Mr. Comer's response to Dr. Kupers's interview is credible. During the two interviews by Dr. Kupers and Dr. Johnson, Mr. Comer had to reveal all the emotionally searing experiences of his entire

## 2. Post–Traumatic Stress Disorder

Dr. Kupers begins his explanation of this disorder by stating that post-traumatic stress disorder ("PTSD") "play(s) into depression." (R.T. 3/26/02 at 29.) He again relies on the DSM–IV for the criteria defining this disorder. (*Id.* at 92.) He testified that there were three main sets of symptoms associated with this disease. First, after a trauma, and as a consequence of it, the initial phase is "reexperiencing of the event" in the nature of "flashbacks, nightmares, and startle reaction." (*Id.* at 32.) The second group of symptoms involves "avoidance, that is . . . the individual closes themselves off so they can constrict their feelings, the range of feelings, they constrain their activities. They don't go places that remind them of the trauma. They don't have as much interest in any kind of activity. They have a restricted range of affect." (*Id.*) The final stage of symptoms he explains are referred to as "arousal." (*Id.*) At this time "the pain of the trauma breaks through" and the individual "can't fall asleep; they're irritable; they don't know what's wrong; they can't concentrate; they become hypervigilant, that is, they're very alert to noises or to certain things; and they have a strong startle reaction." (*Id.* at 33.) He then opines that Mr. Comer "endorses most of that list of symptoms, especially from the time he was in the California Department of Corrections." (*Id.*) He continues that what occurred to Mr. Comer at ADOC, and allegedly typical of PTSD, is that the painful experience causes a closure of "emotional range," a close down of their activities. And what happens is a kind of deadness sets in, and that's where the distancing, the depersonalization, dissociation, derealization, feeling that what's going on is not real, those all follow, and then that's what leads into what I consider the end

stage of post-traumatic stress disorder, which is a **severe depression**. So that is how **depression and post-traumatic stress disorder come together**. (*Id.* at 33–34)(emphasis added.) After discussing SHU syndrome, he conflates the three diagnoses, saying "[s]o here we have three conditions, all of which lead to **depression**." (*Id.* 93–94.)

Because Dr. Kupers's opinion that Mr. Comer has PTSD is dependent on the ultimate finding that he has depression, the Court's analysis could conclude here because the Court has found that Mr. Comer does not suffer depression. It is, however, worthwhile to evaluate Dr. Kupers's opinion that Mr. Comer has PTSD, starting with the authoritative source upon which he places reliance and in light of all the evidence, including the testimony of Mr. Comer and Dr. Johnson.

The Court assumes that some of the experiences Mr. Comer endured while incarcerated by the California Department of Corrections at Folsom, DVI, and Soledad, and while incarcerated in Arizona, including a cell extraction at Maricopa County jail and the four-point inverted punishment at ADOC's SMU I, constituted traumatic events meeting the first criteria in the DSM–IV to find PTSD. Mr. Comer readily admitted that he had some painful experiences at these institutions.

Although the remainder of Dr. Kuper's interpretation of the DSM–IV's criteria for PTSD appears plausible, it is, however, misleading because he imprecisely applies the criteria to Mr. Comer. Apart from some traumatic experience, the DSM–IV describes three groups of symptoms for PTSD, and one or more of each group must be suffered by the patient to establish a diagnosis of PTSD. DSM–IV at 428. The first group of symptoms is that the

life. He had a normal reaction to this process and it was temporary.

patient is "persistently reexperienc[ing]" the traumatic event in at least one of various specific ways. *Id.* Of these, Dr. Kupers mentioned two: "flashbacks" and "nightmares" but he did not state that these events were severe and recurrent. This is required. *Id.* For example, the DSM–IV describes "dissociative flashback episodes," *i.e.*, flashbacks, as causing the sufferer to feel as though the traumatic event is "recurring." *Id.* Also on rebuttal, after Mr. Comer testified that he did not experience flashbacks, Dr. Kupers retracted this aspect of his opinion, conceding that, "[y]es. I think that he might be technically correct about that." (Dep. R.T. at 30.) Dr. Kupers attempted to rehabilitate his diagnosis by identifying a different way in which Mr. Comer "reexperienced" traumatic events as "recurrent and intrusive distressing recollections of the events, including images, thoughts or perceptions." (*Id.* at 30–3.) Dr. Kupers failed, however, to specifically identify any phenomena that he observed in Mr. Comer to support his newly minted opinion of Mr. Comer's alleged persistent reexperiencing of traumatic events.

The second group of symptoms, of which at least three must occur to appropriately diagnose PTSD, require that a patient "[p]ersistent[ly] avoid[s] stimuli associated with the trauma." DSM–IV at 428. Dr. Kupers failed to identify any three of the seven symptoms from this group in the DSM–IV, much less, persuasively point to observable phenomena that establish Mr. Comer is avoiding stimuli associated with the trauma.

Significantly, Dr. Kupers's imprecise account of some of Mr. Comer's characteristics, and casual rejection of others, renders his opinion of PTSD invalid. This is particularly clear with respect to the fourth group of PTSD symptoms, two or more of which must be present to demonstrate that the person experiences "increased arousal" not present before the trauma. Those symptoms include: (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hypervigilance; and (5) exaggerated startle response. *Id.* Dr. Kupers testified that Mr. Comer experienced each of these symptoms, but he failed to point to evidence which supported his opinion, and other credible evidence contradicts his assessment.

Mr. Comer denied having trouble falling or staying asleep, the only basis for Dr. Kupers's opinion was that "most prisoners in that situation" have sleeping problems. (R.T. 3/26/02 at 217.) This is mere supposition. *Daubert* requires that opinions be "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. The incidents cited by Dr. Kupers as examples of hypervigilance[58] and exaggerated startle response were unconvincing, and his interpretation of those incidents were refuted by Mr. Comer.[59]

---

58. Dr. Kupers described hypervigilance as "very alert to noises or to certain things." (R.T. 3/26/02 at 33.)

59. During his testimony Mr. Comer credibly refuted Dr. Kupers's opinion that he suffers PTSD. He has no trouble sleeping or nightmares. (R.T. 3/27/02 at 410; 456.) He does not have flashbacks. In fact he stated that he does not think about the problems at Folsom. (*Id.* at 436; 447–48.) He explained that he is not afflicted with "startle reaction" merely because he reacts when someone shakes the trap door of his cell, particularly at night.

He stated his cell is his house (though he refers to it as his box) and, "[He] could equate that to like to a burglar trying to open your window, same sound." (R.T. 3/27/02 at 452–53.) Similarly his reaction to unexpectedly hearing music in the commissary, which Dr. Kupers characterized as "reality testing," was understandable because Mr. Comer knew that radio music from the commissary is unusual. He later learned why it had occurred on that day. (*Id.* at 422–23.) What is more, Mr. Comer's capacity to concentrate was more than adequately demonstrated throughout his testimony. He seldom misunderstood

In contrast, Dr. Johnson's portrayal of Mr. Comer's characteristics, and her opinion that he does not suffer from PTSD, is both reliable and credible and is consistent with Mr. Comer's characteristics as observed by this Court throughout the past two years, particularly at the competency hearing.

Dr. Johnson observed Mr. Comer at the competency hearing as he watched and narrated tapes of his extractions from two different cells. Later, when asked if someone who was suffering from chronic symptoms of PTSD would be likely to sit calmly, and comment on and narrate videos of the traumatic events, Dr. Johnson testified "if they're chronic, then that would probably be an unlikely thing to be able to do." (R.T. 3/28/02 at 789.) She further testified that Mr. Comer,

> certainly can give you the history [of traumatic experiences], and he has been exposed to what another person would view, or he viewed as traumatic experiences. But the disorder is when you develop the specific set of symptoms as a result of that. But not everybody does. You know, some people develop that syndrome and some people don't, following trauma. And he adapted in other ways. And none of those symptoms [of PTSD] are currently present with him, nor was I able to elicit a history of them over time. So I'm not— I don't believe he had it and then it's just gone now.

(R.T. 3/28/02 at 790–91.)

When Dr. Johnson "first started evaluating him, obviously, [she] thought about post-traumatic stress disorder and she explored those symptoms to find an ab-

sence." (*Id.* at 790.) After she concluded that he does not have PTSD, and then received and reviewed Dr. Kupers's report, she made "a specific effort" the day before Mr. Comer testified at the competency hearing "to sit down and look at those issues again" and "reviewed ... in a fair amount of depth" the symptoms of the diagnosis with Mr. Comer before he testified. (*Id.*) She reaffirmed that he does not have PTSD. (*Id.*) She also refuted Dr. Kupers's opinion that Mr. Comer was able to conceal the symptoms. She testified that:

> [h]e thought about each of the questions that I asked directly, and obviously indirectly, I approached the same symptoms pictures to see, you know, whether I could find any evidence—evidence of it. And, you know, he asked questions if he didn't feel he entirely understood what I was asking him, to clarify what it was, and that—that is not the way he has handled those experiences that he has had.

(*Id.* at 791.) She concluded that:

> someone who had chronic and severe post-traumatic stress disorder would appear much more ill on a day-to-day basis in the prison system than Mr. Comer does, because he is being exposed to those very triggers that could remind him or precipitate that kind of reaction if he had this disorder... [I]t wouldn't be something that he could box up and put away and put on the shelf, because there are too many potential triggers in the environment. If indeed he had this disorder, he would be pretty symptomatic on a day-to-day basis.

questions or responded inappropriately, which was remarkable because his appearance at the competency hearing was the first time in fifteen years that he had been outside of a prison. He has demonstrated periods of irritability and outbursts of anger, but they

certainly occur less frequently than previously in his incarceration history. The only notable negative emotion he occasionally expressed during his testimony was frustration, which is understandable considering his view that this matter should had been resolved long ago.

(*Id.*) In the end, she did not find any PTSD symptomology in Mr. Comer that was apparent on a day-to-day basis.

Concomitantly, Mr. Comer gave the Court a cogent and detailed account of his incarcerations, the institutions where he was housed, and their conditions. He did not minimize the extent of violence among the prisoners, or the brutality and cruelty of guards towards inmates while he was incarcerated in the California Department of Corrections, particularly Folsom. Nevertheless, he noted that he actually "liked Folsom because something was always going on." (R.T. 3/27/02 at 340.) The Court finds that while he gave this account, Mr. Comer manifested none of the groups of symptoms identified in the DSM–IV for the diagnosis of PTSD. Rather, Mr. Comer explained with actual pride that he learned coping mechanisms to survive his prison experiences, including developing close relationships with prisoners that he considered his "brothers." (*Id.* at 350.) He recounted his institutional history which brought him to ADOC in April 1988, where he first met and bonded with Robert Vickers. Again expressing self-respect, and not symptoms of distress, he provided a detailed history of the three units in which he has been housed by ADOC (CB6, SMU I, and SMU II).

As noted above, Robert Vickers was considered the most dangerous prisoner at ADOC who, in conjunction with Mr. Comer, posed a very serious security problem at the prison. Mr. Comer acknowledged that he and Mr. Vickers were locked down three weeks before they were moved from CB6 to SMU I, because "from day one that I got [to CB 6 in April 1988], we were nothing but a problem together." (R.T. 3/28/02 at 677.) Somewhat boastfully, Mr. Comer explained how he and Vickers, for recreation, "used to spend our time trying to circumvent security all these years." (*Id.* at 675.) He continued explaining that as an inmate "you don't have to have [self-]control" because "[t]here are no rules for convicts in [prison]. None at all. There's no rules for inmates." (*Id.* at 420.) He related how he and Vickers cut through the chain link so that they "could go wherever the hell [they] wanted to go [in CB 6]. And that's what we were doing;" they "made shanks [at CB6] that were like ... ice picks, go right through [corrections officers'] vests;" and they went after a "black guy" who killed a white Aryan Brotherhood prisoner and "almost got the guy" before they were caught. (*Id.* at 678.) He did not avoid testifying about the violence or indicate an inability to recall events relating to it.

The violence and his willing participation in it persisted during his incarceration at SMU II, and again he discussed it without any manifestation of anxiety or stress. Further, he did not blame ADOC for the disciplinary actions they took in response to his behavior and in particular placing him in a segregated housing unit. He testified, "I built that cell that [Deputy Warden] Marshall put together for me. He just paid for it." (*Id.* at 679.) When queried by the Court whether his will to live and his healthy state of mind had been overborne by the violence and cruelty he had witnessed and participated in while incarcerated he responded: "Ma'am, I've spent 15 years in an isolation cell. Already. And look at me. What is wrong with me that I'm hiding—what am I hiding?" (*Id.* at 712.) He readily admitted that Folsom "was bad;" Soledad "was bad;"and SMU "was bad. Different degrees of badness." (*Id.* at 712–13.) He concluded by explaining that he happened to be one of the prisoners who survived and he did so by "disconnect[ing]" from the violence, and then credibly asked the Court: "So what? What's the big deal?" (*Id.* at 713.)

The answers to Mr. Comer's questions are that the Court finds that there is nothing mentally wrong with him, and that his capacity to distance himself from the violence in prison is his means of successfully surviving without incurring psychiatric illnesses. The tool of "disconnecting" as he refers to it, is not coextensive with, nor does it resemble the PTSD criteria for "avoidance" of trauma "stimuli" set forth in the DSM–IV. DSM–IV at 428. This was clearly demonstrated during his testimony and was confirmed by the opinion of Dr. Johnson and the testimony of Deputy Warden Marshall and Sgt. Hackney. (R.T. 3/26/02 at 535; R.T. 3/27/02 at 568, 571–72, 574–77, 585, 604–606; R.T. 3/28/02 at 758, 760, 762, 914–15.)

Mr. Comer does not suffer post-traumatic stress disorder.

### 3. SHU Syndrome

Finally, Dr. Kupers claims that Mr. Comer suffers from the mental disease of segregated housing unit (SHU) syndrome. The diagnosis does not appear in the DSM–IV, but Dr. Kupers asserts that it is in the literature and clinical experience. Additionally, he testified that "[i]t takes quite a few years and quite a lot of interest on the part of the psychiatric community for a diagnosis to enter the DSM–IV." (R.T. 3/26/02 at 93.) It is Dr. Johnson's opinion that SHU syndrome is not an accepted diagnostic classification but is merely a concept: it is a set of symptoms and the existing diagnoses describe the phenomenon. (R.T. 3/28/02 at 804–805.)

The Ninth Circuit has held in *S.M v. J.K.*, 262 F.3d at 921, that it is not necessary that a psychiatric illness be listed in the DSM–IV in order to meet the requirements of Fed.R.Evid. 702. Because none of the parties contested the validity of this

theoretical mental disorder, the Court will assume that it has met the rigors of Rule 702, and that Dr. Kupers is qualified to give an opinion regarding whether Mr. Comer experiences the symptoms associated with it.[60]

As with PTSD, it is Dr. Kupers's opinion that there is significant overlap between depression and SHU syndrome. In fact he testified that "the depression develops as the end stage of the SHU syndrome. So here we have three conditions, all of which lead to depression." (R.T. 3/26/02 at 93–94.) Hence, once again, because this Court found that Mr. Comer does not have depression, the analysis of SHU syndrome could conclude here. Evaluation of the syndrome, however, and in particular whether any of the symptoms are apparent in Mr. Comer's behavior, is worthwhile because the Court finds that he does not presently experience the symptoms of SHU syndrome.

It is undisputed that Mr. Comer spent a considerable amount of time in segregated housing units while incarcerated in the California Department of Corrections, in the Maricopa County jail, and in ADOC's SMU I and II. According to Dr. Kupers, the structure of these facilities generally cause "significant psychiatric symptoms [to] develop." (*Id.* at 65.) The reason is that these units "pretty substantially cut them off from social contact with other prisoners, who are their peers, make them just about totally idle. They're in the cell with very few things to do, very few activities." (*Id.*)

Although the theory of the psychiatric disorder was recognized by the Supreme Court in 1890, in the latter part of the Nineteenth Century Dr. Stuart Grassian "really invented the concept of SHU syn-

---

**60.** The Court has no doubt from Dr. Kupers's experience and knowledge of SHU syndrome, as well as his educational background, that he is qualified to offer an opinion concerning whether Mr. Comer is afflicted with the symptoms of this disorder or concept.

drome." (*Id.* at 67.) What has been learned from studies of the syndrome is that, according to Dr. Kupers, "[i]solated confinement causes severe symptoms in just about everyone." (*Id.*) The symptoms observed from this type of confinement are, in Dr. Kupers's opinion that the person "start[s] becoming disinterested in the outside world; they start to become numb, to some extent." (*Id.* at 77.) The list of the most common symptoms are the ones identified by Grassian, though Dr. Kupers does not believe that someone with SHU syndrome must experience any of the Grassian symptoms and can experience others. (*Id.* at 79.) This opinion has hazy contours, however, because an alternative list of symptoms was not provided by him. Further, the Court assumed that the other symptoms were *observed* by Dr. Kupers in some prisoners, in some institutions, and under varying circumstances, but this assumption undermines Dr. Kupers's opinion.

Applying the list of Grassian symptoms to Mr. Comer, Dr. Kupers found that he has SHU syndrome. The first is "massive free-floating anxiety," which Dr. Kupers found Mr. Comer suffered at Folsom and SMU I. (*Id.* at 78.) Mr. Comer informed Dr. Kupers, however, that he stopped experiencing such anxiety about "halfway through his tenure in SMU I." (*Id.*) It is Dr. Kupers's opinion, which he admits is unsupported by Mr. Comer, that the anxiety terminated because Mr. Comer "started distancing himself." Then this allegedly caused his "compulsions [to] become more intense." (*Id.* at 78.)

The second common symptom is "hyperresponsiveness," which Dr. Kupers found Mr. Comer experienced in SMU I because of midnight cell searches. (*Id.* at 80.) Dr. Kupers does admit that Mr. Comer told him the searches ceased. (*Id.*) Another symptom is "perceptual distortions and hallucinations and multiple fears in multiple spheres." (*Id.*) The one incident Dr. Kupers believes demonstrates this symptom is that while in custody at Folsom, Mr. Comer thought he heard "the voice of a rat who was in his cell." (*Id.*) In the opinion of Dr. Kupers, this symptom still exists because during the interview Mr. Comer unexpectedly heard music and responded with a strange look on his face. Dr. Kupers interpreted this as Mr. Comer "questioning his own perception of reality." (*Id.* at 81.) The next symptom is "derealization" experiences purportedly evidenced by Mr. Comer's December 20, 2001 declaration. (*Id.*) Another symptom is difficulty with concentration and memory, and Dr. Kupers found that Mr. Comer has intermittent difficulty concentrating and that he has significant memory lapses. (*Id.* at 81–82.) His support for this observation is that Mr. Comer does not remember meeting habeas counsel, nor various disciplinary sanctions imposed on him. (*Id.* at 84.) Acute confusional states is also a symptom that Dr. Kupers testified that Mr. Comer has, but "not so much in recent years." (*Id.* at 85–86.) Dr. Kupers opined that "all through [Mr. Comer's] record" and interview were indications of the emergence of primitive "ego-dystonic" aggressive fantasies, which are rage reactions and discomfort with one's perception of oneself. (*Id.* at 87.) Ideas of reference and persecutory ideation, *i.e.,* paranoia, is also something Dr. Kupers believes Mr. Comer has had "on and off throughout his experience in prison." (*Id.*) In Dr. Kupers's view, Mr. Comer experiences "motor excitement, often associated with sudden, violent destructive or self-mutilatory outbursts" evidenced by banging his fist on the wall and walking in his cell. (*Id.*) Finally, Dr. Kupers stated it was his personal observation that compulsive activities occur with chronic SHU syndrome and Mr. Comer's walking, shank-making, and depression are examples of Mr. Comer's compulsions.

(*Id.* at 88–92.) He concludes his diagnosis of SHU syndrome with the assessment that "[Mr. Comer] has his own idiosyncratic ways of coping, which accentuates certain symptoms." (*Id.* at 92.)

The Court finds it undisputed that Mr. Comer was subjected to some physical brutality and abuse while incarcerated that no human being should be made to endure for any length of time. The Court has no difficulty concluding that this abuse would shock even a person with hardened sensibilities; and that even a cold-eyed critic of any disapproval of prison administration would agree that these forms of corporal punishment run afoul of the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 2245, 153 L.Ed.2d 335 (2002)(holding "[t]he Eighth Amendment succinctly prohibits 'excessive' sanctions. It provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' "); *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)(holding that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man"); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(holding that the gratuitous infliction of wanton and unnecessary pain is a violation of the Eighth Amendment). The question before the Court however, is whether Mr. Comer presently suffers any mental illness, including SHU syndrome, because of or related to the abuse.

Dr. Johnson and Mr. Comer refute Dr. Kupers's opinions and findings concerning the SHU syndrome and whether Mr. Comer is afflicted with it. The Court finds Dr. Johnson's opinion reliable and supported by the credible evidence.

Dr. Johnson regularly works with patients who are in segregated housing units, and in her experience, prisoners confined in these units do not develop mental illnesses. (*Id.* at 805.) She discussed at length with Mr. Comer the deplorable experiences he endured, and it was her judgment that today he is not rendered mentally ill because of them. In fact she believes that "his mental health actually provided him some protection or ability to adapt to some of those experiences." (*Id.* at 811.) She added,

[i]n some individuals ... who are unable to process that trauma, it would make it more difficult in the future to endure, and that would be where you would get the symptoms of post-traumatic stress. In some individuals, which is how I see Mr. Comer having had that experience, in future experiences he was better prepared physically and psychologically to meet that. It wasn't a surprise as to him what was going to happen; he anticipated it. So he actually might have been able to handle the second or third one better than he handled some of the earlier ones, but handled them better down the road because of his experience and successful emotional handling of the prior episodes.

(*Id.* at 855.) Further, Dr. Johnson did not believe that Mr. Comer's shank-making was a compulsion because "[t]hat would be a very unusual compulsion ... it would be a very atypical compulsion if it was." (*Id.* at 812.) Further, in her discussions with Mr. Comer she learned that over time he refined his talent for making shanks, which became very useful to him in prison. She added that "it's been a very deliberate, controlled activity that's been done for specific purposes at various times more or less throughout his prison existence" and that she "never found any evidence in talking with him or looking at his history that it was a behavior he couldn't stop." (*Id.* at 813.)

Mr. Comer's testimony corroborates Dr. Johnson's opinions. Further, the Court

finds that Mr. Comer has a very good memory and ability to concentrate. His explanation for his failure to remember visits by habeas counsel and disciplinary sanctions is logical. He testified that he remembers only "what [he] wants to remember." (R.T. 3/27/02 at 411–12.) It is beyond peradventure that people generally remember what is important to them. Visits by habeas counsel and the imposition of discipline was immaterial to Mr. Comer, but his relationship with his prison brothers, particularly Mr. Vickers, or Amy Young, were and are matters of significance to him. Moreover, Mr. Comer demonstrated that he has a snap tight memory for a variety of matters. For example, he recognized a doctor in the audience at the competency hearing, who he had not seen in fourteen years. (*Id.* at 351.) He also remembered details of his first meeting with Mr. Vickers which occurred in April 1988. (*Id.*) He remembered which CDC prisons Dr. Haney and Dr. Kupers visited. (*Id.* at 338.) Additionally, he often corrected special counsel when she made mistakes concerning various factual matters. (*Id.* at 376, 392.) He made a number of factual corrections to Dr. Kupers's report. (*Id.*) He also frequently works crossword puzzles. (*Id.* at 424.) He understood almost all of the questions asked of him at the hearing, and gave appropriate and insightful responses to them.

Mr. Comer also explained that he has made shanks for his protection and to engage in aggressive action in prison when it suited him. He told the Court "you've gotta understand if something hurts you in [prison] and you're totally free to go to any extent of violence that you wish to, and nobody can stop that . . ." and that there is no one "to watch his back" in prison and there are "no rules for convicts." (*Id.* at 713; 344, 420.) He expounded, "making shanks, I need one, I make one. The last one I made was on the anniversary of Bonzai's execution, and you remember I used to call it murder. Bonzai was executed . . . I felt I had to avenge it." (*Id.* at 430.) He added it was his choice "I didn't—I didn't hear any—any DOC officer come in there and tell me to make any shank. That was me. I made it myself. That was my choice. I made the same choice not to make any more." [61] (R.T. 3/27/02 at 441.) Mr. Comer addressed Dr. Kupers's supposition that his walking was also a compulsion. He explained that he walks for exercise to stay healthy, and that it is an adaptive mechanism for thinking and meditating. (R.T. 3/27/02 at 405, 431–33.) Mr. Comer's explanation for his reaction to the music he heard during his interview with Dr. Kupers was sensible. (R.T. 3/26/02 at 81; R.T. 3/27/02 at 424.) Mr. Comer's concern regarding midnight cell searches was normal. (*Id.* at 451; n. 59.) His testimony, and that of those who know him well, does not reflect that he suffers paranoia or is uncomfortable with his perception of himself. Rather, he has a strong sense of self.

The Court also finds that Mr. Comer is not inactive or "dead in his cell." He takes three showers a week; has three recreational periods a week for one and one-half hours; he listens to tapes from Amy; writes to her everyday; reads the mail she sends to him almost everyday; he receives regular visitation from Amy and his lawyers; visits with the officers he cares about, including Deputy Warden Marshall and Sergeant Hackney; makes a

---

**61.** Dr. Kupers readily admitted that when Mr. Comer arrived at Folsom there were six stabbings, and that Mr. Comer "began to make shanks in self-defense," and that his shank-making skill could have been due in part to his past, as an enforcer for the Aryan Brotherhood. (*Id.* at 137, 141.) Dr. Kupers conceded that whether Mr. Comer any longer needed a shank was in dispute. (*Id.* at 137.)

five-minute phone call each week; enjoys reading a book every two weeks; works crossword puzzles; reads the newspaper; has had contact with his father; had contacts with Robert Vickers; cares about people, including Amy, his daughter and granddaughter; and he has hopes and dreams for his daughter and granddaughter. (*Id.* at 387, 369, 370, 424, 437, 419–20, 444–45, 692–93, 704.) His close relationship with Amy Young is reflected on the video of his testimony by his repeated smiles and glances to his left where she was seated in the audience throughout the hearing.

Finally, Mr. Comer has a realistic and mentally healthy attitude about his conditions of confinement. He testified that he does not,

believe [he has] a life that will make me jump up and down and clap my hands and go to a party or nothing. Within the limits that I have, I try to live it fully. That's like with Amy. We just do with—with what we got, what we can.

(*Id.* at 442–43.) Mr. Comer described his conditions at SMU II as heaven compared to Folsom, which was hell, and the staff at SMU II as humane. (*Id.* at 670.) He did not unrealistically paint a "rosy picture of SMU II," but compared to other units "it's better" because it is "less dangerous," "less assaultive," "cleaner" and "smells" better. (*Id.* at 506–507.) Mr. Comer observed that by the time ADOC officers "stripped [him] out" of the Rec Pen in 1999, there was not a bruise on him, whereas the guards at Folsom beat inmates because, he surmised, they thought the more they beat inmates the better persons they would become. (*Id.* at 673–74.) Mr. Comer's cell is also much larger and cleaner now than the ones at Folsom and the Lexan on the cell fronts keep the prisoners from "getting stuck" with a shank or darted. (*Id.* at 675.) The temperature in the cell is comfortable. (*Id.* at 677.) All of these features are important to Mr. Comer on a day-to-day basis. (*Id.*)

Significantly, Mr. Comer has adapted well to the conditions in SMU II. Persuasively, he described his present conditions and his capacity to adjust to them. He testified:

It is harsh. But it ain't gonna kill you, ain't gonna drive you nuts ... We got a few guys went nuts back there. That's 'cause they let it get to them. They need— you need to recognize it when it's getting to be a problem and find yourself another outlet. Just add one more thing will keep a guy going. But that, you do that on the street.... You get depressed on the street, don't you go do something? Don't you find—find something else to cure that? It's the same thing here. You get sad, get off your damn bunk. Instead, everybody wants to sit on their bunk. "Cause that's all I can do." It's not all you can do. You can get your butt off the bunk, walk around. Think. If you—all you can think about's your ... old life, think about it. If something will center you— center you, focus you, and then you'll make it through the next day. And the next day, whatever sadness you had the day before, it will start abating. It just start[s] lessening on you. That's all you gotta do. One day at a time.

(R.T. 3/27/02 at 480–81.)

Undeniably, some people do not have the mental health and the adaptive skills to tolerate segregated housing and will immediately, or inevitably develop psychiatric illnesses when housed in these units. Mr. Comer, however, has developed the means to cope with the conditions, and he exercises the initiative to ensure that he maintains his mental health while housed in them. According to Dr. Johnson, Mr. Comer is successful and functional in prison because he lives "it to the fullest of his

capacity in the environment that he is in;" by learning to "value smaller increments of things" and to "gain pleasure on a day-to-day basis with the little things in his existence." (R.T. 3/28/02 at 792–93, 814.) He concurred, volunteering "[w]ithin the limits that I have, I try to live it fully." (*Id.* 442–43.)

Recently, his segregated conditions have improved, allowing him a walkman and a television set, and he and the other inmates in the unit now have more meal selections. (R.T. 3/27/02 443–45.) The enhanced stimulation, however, has not changed Mr. Comer's emotional status, or improved his already healthy mental status. Also, of significant note, the changes certainly have not altered his decision to waive his appeals and proceed to execution.[62]

Mr. Comer is not afflicted with the SHU syndrome.

Finally, it is the opinion of Dr. Johnson that Mr. Comer is not currently suffering

a "diagnosable mental illness"; that historically he has never met the criteria for a mental disease or defect except perhaps antisocial personality disorder; but that his behavior as a juvenile does not support a conclusive finding for even this disorder. (*Id.* at 808.) She comprehensively detailed the nature of her mental status examination followed by her psychiatric assessment noting that "from a cognitive aspect . . . he's oriented, meaning he understands where he is;" "his attention to self-care . . . is excellent;" "[t]here is no problem with his motor activity;" "[h]is conversation is coherent;" "he is not and has not for years had any hallucinatory experiences or perceptual disturbances;" "his thought processes are intact;" he has "a full range of [mood] affect;" he was "[v]ery cooperative;" she "never saw him dissociate through any of the 50–plus hours of interviewing that [she] had;" his "general knowledge was good" and his "[c]oncentration was excellent;" and, he "doesn't have any significant memory problems." She

**62.** On April 6, 2002, the Court, accompanied by counsel for all the parties, toured the cells in which Mr. Comer has been held during his confinement by ADOC. As expected, the wet and dry cells in SMU I and II were very uncomfortable because they are very small. We also toured his former cells in SMU I and CB6. While inside these cells without Lexan doors, the Court found they were not more uncomfortable than Mr. Comer's present cell at SMU II with Lexan doors. We toured the recreation area now used by Mr. Comer from which one can see the sky. We saw Mr. Comer in his cell at about 9:30 a.m., and the Court spoke to him from outside of his cell. He was aware that we were coming to visit, but did not know when it would occur. He appeared alert and slightly out of breath when we arrived because he had been working out in his cell. The Court was able to speak to him and he was able to respond without raising the tone of his voice because he spoke directly through the slight opening where the cell door meets the wall. After the Court's conversation with him he carried on an animated conversation with one of his

habeas counsel. He was removed from his cell to allow us to enter and inspect it, and the Court noticed that he appeared healthy and in good spirits. Inside of his cell, with the door closed, light could be seen through the Lexan door. The light and temperature in the room were adequate. His bed was comfortable enough, and he had a TV and walkman on the side of his bed. The cell also had a mirror, and his box of personal papers was kept under his bed. Obviously the Court's limited experience in Mr. Comer's cell does not approximate the life he lives everyday. However, the Court found that his cell was not intolerable. His cell is not the place a non-imprisoned person would voluntarily choose as a home. Having personally observed and inspected it, however, the Court finds that it is a false premise to assume that every person who lives in Mr. Comer's cell must at some time develop psychiatric illnesses. This visit confirmed the evidence establishing that Mr. Comer has lived in, and survived, his conditions of confinement, including segregated housing, while in ADOC custody for the past 14 years without a current psychiatric illness.

concludes that she "feel[s] very firmly, and over time has seen it bear out, that his thought process is not being impacted by **any** mental disease, disorder, or defect at this time." (*Id.* 815–20)(emphasis added.)

Because of her extensive relevant experience, thorough and lengthy evaluation of Mr. Comer, and because of the reliable and consistent validation methods employed by her to reach her opinions, the Court concurs with her judgment and conclusion. The Court finds that Mr. Comer does not suffer any mental disease or defect at this time.

### 4. Legal Position and Options Available and Rational Choices

The Court has found that Mr. Comer does not have a mental disease or defect, which according to the first part of the three-part analysis in *Rumbaugh* for determination of competency obviates parts two and three. Evaluation of the second and third parts, however, is valuable because it ensures that the reasons for Mr. Comer's important decision was thoughtfully considered by him and is rational.

First, Mr. Comer testified plainly and logically that he understands that the merits of his habeas appeal are legally strong because they were explained to him by both special and habeas counsel, and he is aware that the Ninth Circuit expressed concerns about his conviction and sentence. Further, Dr. Johnson repeatedly reminded him of the option to change his mind, as did both habeas and special counsel. (*Id.* at 700–708.) The Court also inquired of him concerning the same subject in the following colloquy:

Q. You've heard and we've talked a lot about what could happen if your habeas is considered by the appellate courts. And I think you have said that you believe, from everything that you've been told and everything that you've read, that you have a good—good prospects for a new sentencing. Right?

A. Yes, ma'am.

Q. Okay. And certainly—

A. They did their work.

Q So that would mean—if you got a new—another sentencing, do you understand, then, that you may not get the death penalty?

A. Yes, ma'am.

Q. And that there's a good chance of that, at least the way it's been presented.

A. Yes.

Q. You gotta think about that. And you may even get a new trial.

A. Yes.

Q. And you understand, then, that the standard for the government will be the same-

A. Yes.

Q. —proof beyond a reasonable doubt. You understand that?

A. Yes, ma'am.

Q. It would be their obligation, not yours—

A. Yes.

Q. —to prove that you committed the crimes, right?

A. Yes, ma'am.

Q. Do you understand you could be found not guilty?

A. Yes, ma'am.

Q. And I presume that you don't believe that that's really much of a possibility, am I right?

A. No, ma'am.

Q. And why?

A. I did it.

Q. Well, but the government has to prove it. They can't—you don't have to testify.

A. Doesn't matter. I stuck a gun in the guy's ear, pulled the trigger.

Q. You understand that if the government were to try this case 13 years later or by the time this decision is made, habeas decision is made, and if it was made in your favor, that there would be an enormous amount of delay in the proceedings before they tried you?

A. It could be, yes, ma'am.

Q. And you understand that memories fade over that long period of time and the government-

A. Yes, ma'am.

Q. —it's often much harder for the government to prove their case—

A. Yes, ma'am.

Q. —the second time? And that evidence could be destroyed and witnesses could disappear or could die?

A. Yes.

Q. And those witnesses who were vital in your trial—And you remember your trial.

A. Yes.

Q. —may not be around.

A. That's quite possible.

Q. With all of that, then, with that possibility, you could—you could have a not guilty verdict in your favor and you'd be out on the street, right?

A. No.

Q. Why not?

A. I'll never be on the street. I got 300 years, 300 some odd years on top of that. On top of that, with my values now, wouldn't—I wouldn't put all the people through another trial. I'd just go up there, plead guilty. There's no sense to it. That's what I mean. I've already been lawfully convicted. Everything's like little procedural errors. It doesn't come down to whether I did it or not. What, K.C. Skull called me a monster-

Q. Let me see if I understand. You're saying a lot of different things

now. It seems to me that what you're saying is that the possibility's not very strong that you could be found not guilty?

A. No, no, I figure I'd probably have just as good a chance then as I did the first time around. Maybe even a little bit better.

(R.T. 3/28/02 at 727–30.) Mr. Comer's testimony makes clear that he is aware that he may have a good chance for reversal of the death sentence and perhaps even the conviction, but he concludes this possibility is no consolation because he will still be facing 300 years of incarceration, and his values have changed. (R.T. 3/28/02 at 724–31.) It is also apparent from his testimony that Mr. Comer is fully cognizant of his legal options including that he can change his mind but that if he drops his appeal, he may not be allowed to later reinstate it. (*Id.* at 703–04.)

In the beginning the Court was naturally perplexed with and skeptical of Mr. Comer's decision to end his appeal and accept execution. Dr. Johnson also grappled with it because as she explained, it is "an odd thing to assess, not to assess so much as to explain." (R.T. 3/28/02 at 821.) Despite the Court's original hesitation to accept as rational Mr. Comer's chosen course, it is now clear to the Court that his decision is a rational one.

Mr. Comer has consistently given everyone who inquired of him, though sometimes using immoderate terminology, the same reason for his decision. Although not immediately apparent, his decision is a consequence of an evolution in his thinking over a period of years which thought process was greatly influenced by his friend, Amy Young. Dr. Johnson emphatically described Amy and her effect on Mr. Comer as: she is "not a criminal. She's very, you know, mainstream in society, and she has shared her values and he's incorporat-

ed many of those and the kind of values of other people in society." (*Id.* at 798.)

Throughout his testimony including the colloquy with the Court, Mr. Comer consistently gave the same reason for his decision. He explained that it was a developing process and that Amy introduced him to another way of life. He testified, "I started thinking about my victims, thinking about everything. It's just time to end it now. And, you know, I never expected we'd have to do this here." (R.T. 3/27/02 at 727.) With the passage of time he also came to conclude that he should be punished for his crime and emphasized "I've been saying for a year—for, you know, the last couple of years, at least, I killed this guy. I'm sentenced to death" and he is now prepared to accept the punishment. (*Id.* at 731.) The Court questioned Mr. Comer about whether he could reconcile his statement in a letter to habeas counsel that "We gave up the right to kill when we became human beings," Tr. Ex. 25, with his decision to seek his own execution by the government. He explained that though he does not believe in the death penalty, it is the punishment assessed by society, and he now accepts that assessment.

Perhaps more elegantly, Dr. Johnson confirmed that Mr. Comer's decision was a mature one that has come from introspection. She testified that he regrets what he did; he realizes that he has hurt many people in his life; and he's made the decision that the punishment awarded for the crime is just and he's ready to participate in it. She stated that "from the time I began seeing him, to seeing him again [the day before he testified] he has grown and evolved tremendously." (R.T. 3/28/02 at 798.) Concomitantly, though he expressed

the same reason for his choice at her first meeting with him, he had

> gone on and begun to deal even more with his eventual demise. He's thought it through. He'd sought out more information. He talked to Amy. He realized before he died he wanted to touch base with significant family members. He'd begun the process. He was thinking about all the loose ends that he wanted to tie up.

(*Id.*) [63] Importantly, she remarked that the "remorse, and the feeling of justice, were there from the day [I] started talking to him about this. But they have become, I think, clearly, the predominant reasons," which are "more prosocial ... he's able to place himself in the larger group, both within his environment and within society, and make some decisions." (*Id.*) She concluded that he wants "to die a common, peaceful death ... [and now] he doesn't want to go out in a blaze of glory or hurting anyone." (*Id.* at 825.) Significantly, she stated that he repeatedly empathized that this is *his* choice and "what's most important [to him] is that he has the opportunity to choose." (*Id.* at 822.)

The Court finds that Mr. Comer fully understood at the time he made his decision, and he understands now, the legal options and consequences of his decision. Further, the Court finds that his decision to waive his habeas appeal and accept execution is credible and rational in accordance with the law.

## IV. Voluntariness

■ The Ninth Circuit also directed this Court to determine "the separate question of whether [Mr. Comer's] purported decision to waive further legal review is volun-

---

**63.** He purposefully took the time to learn about death by lethal injection, and he made funeral plans. (R.T. 3/27/02 at 459–65.) Dr.

Johnson discussed these matters with him as recently as the day before he testified. (*Id.* at 574–75, 666; R.T. 3/28/02 at 822.)

tary if [this Court] finds him competent. Mr. Comer's habeas counsel assert that their client's conditions of confinement have extinguished his desire or will to live, thus rendering his apparent decision to withdraw this appeal involuntary." *Comer*, 215 F.3d at 917. The Ninth Circuit noted that:

> The Supreme Court has held that a waiver of a petitioner's "right to proceed" is not valid unless, among other factors, it is "knowing, intelligent, *and voluntary*." *Whitmore v. Arkansas*, 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)(emphasis added). "A waiver is voluntary if, under the totality of the circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir.1998). Put differently, a decision is involuntary if it stems from coercion—either mental or physical. *See, e.g., Brady v. United States*, 397 U.S. 742, 754, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Indeed, courts have recognized that a decision to waive the right to pursue legal remedies is involuntary if it results from duress, including conditions of confinement. *See, e.g., Smith v. Armontrout*, 812 F.2d 1050, 1058–59 (8th Cir.1987)(reviewing for error the district court's determination on whether petitioner's particular conditions of confinement rendered his decision to waive appeals involuntary), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987); *Groseclose ex rel. Harries v. Dutton*, 594 F.Supp. 949, 961 (M.D.Tenn.1984)("In the judgment of this Court, the conditions of confinement inflicted on Mr. Harries are so adverse that they have caused him to waive his post-conviction remedies involuntarily."). Mr. Comer describes the conditions of his confinement in nothing short of Orwellian terms. He tells us that he is in "sensory deprivation," has no access to legal materials, is permitted nothing in his cell, and must walk continuously for fear of becoming a "veggie." Mr. Comer's choice between execution at the State's hands and remaining in the particular conditions of his confinement may be the type of "Hobson's choice" that renders his supposed decision to withdraw his appeal involuntary. *Cf. Gilbert v. Lockhart*, 930 F.2d 1356, 1360 (8th Cir.1991)(recognizing that providing defendant with "Hobson's choice" between incompetent lawyer or no lawyer violates right to counsel). The record is incomplete as it bears on Mr. Comer's prison conditions and the effect they are having on his purported decision to abandon his desire to live. Faced with this record, we cannot determine the voluntariness of Mr. Comer's decision and we must, of course, remand to the district court for a decision on this critical issue. The issue is whether Mr. Comer's conditions of confinement constitute punishment so harsh that he has been forced to abandon a natural desire to live.

*Id.* at 917–18. It further directed this Court "to make an individualized determination as to whether Mr. Comer's particular conditions of confinement have rendered his decision to withdraw this appeal involuntary[,]" rather than to assess whether the conditions on Arizona's death row violate the Eighth Amendment in general. *Id.* at 918.

▮ As noted by the Ninth Circuit, the voluntariness of a waiver of legal review is necessary. In the context of the waiver of the right to counsel or to stand trial, a waiver is voluntary if the defendant is fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, and he was not induced by threats or promises to discontinue improper harassment, misrepresentation, or improper inducements. *See Johnson v.*

*Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Brady v. United States* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Parke v. Raley,* 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992)(guilty plea); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)(waiver of counsel).

Courts have similarly required that waivers of legal review by condemned inmates be voluntary. *See Mata v. Johnson,* 210 F.3d 324, 330 (5th Cir.2000); *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir. 1998); *In re Zettlemoyer,* 53 F.3d 24, 27 (3d Cir.1995); *Wilson v. Lane,* 870 F.2d 1250 (7th Cir.1989). For example, in *O'Rourke v. Endell,* 153 F.3d 560, 567 (8th Cir.1998), the Eighth Circuit held that without a knowing, intelligent and voluntary waiver of an inmate's right to proceed and "without the appointment of a 'next friend' to advocate the position that the prisoner is incompetent," a state court competency hearing is not full and fair and does not comport with due process so as to be entitled to a presumption of correctness on federal habeas review. The court went on to observe that:

> The two questions—the competency to waive a right and whether the waiver was knowing and voluntary—are distinct, although we have noticed in reviewing the record in this case and researching the applicable law that the distinction is not always made clear.
>
> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*Id.* at 567–68 (quoting *Godinez v. Moran,* 509 U.S. 389, 401 n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (citation omitted)). The Eighth Circuit agreed that the record of the state court evidentiary hearing failed to demonstrate that the inmate had appreciated the consequences of his waiver of state appeals where no one represented the position that the inmate was incompetent and/or that his waiver was not knowing and voluntary. *Id.* at 568. Specifically:

> O'Rourke's statement that he wished to be executed falls far short of demonstrating that he fully understood the consequences if he voluntarily short-circuited his state postconviction challenges to his conviction and sentence. The court never explained to O'Rourke the significance of his decision to waive his postconviction appeal. No one questioned him as to his understanding of the possible results of a successful appeal, which might have included not only a lesser sentence but a new trial with a potentially different outcome.

\* \* \* \* \* \*

> Even allowing for the state circuit court's ability to observe O'Rourke's demeanor and his apparent capacity to argue cogently about his right to represent himself, this record falls short of demonstrating that O'Rourke was able to "understand his position or make a rational decision concerning" his waiver. *Anderson v. White,* 32 F.3d 320, 321–22 (8th Cir.1994). Instead, the record as a whole demonstrates that it cannot be said with any satisfactory degree of confidence that O'Rourke's waiver of his Rule 37 appeal was knowing and voluntary.

*Id.* at 568–69. The Eighth Circuit went on to reverse the district court's determination that O'Rourke had nevertheless not been prejudiced.[64] *See id.* at 570.

---

64. The district court determined that the state court hearing was not entitled to a presump-

While numerous cases have held that a waiver of legal review by a condemned inmate must be voluntary, few cases have addressed whether a condemned inmate's conditions of confinement have rendered the inmate's decision to waive legal review involuntary. Those cases are discussed next.

### A. Groseclose v. Dutton

The question whether a condemned inmate's waiver of state and federal review has been rendered involuntary by his conditions of confinement appears to have first been addressed in *Groseclose v. Dutton*, 594 F.Supp. 949, 951 (W.D.Tenn.1984). In *Groseclose*, third-party petitioners filed a next-friend habeas corpus petition on behalf of a condemned inmate, Ronald Harries, who had waived state post-conviction review and declined to sign the federal habeas petition. *See id.* The district court stayed Harries's execution pending an evidentiary hearing to determine whether the administration of drugs to Harries by respondents had interfered with his ability to appreciate the gravity of his decision to waive post-conviction review so as to establish standing of the petitioners. *See id.*

Harries subsequently clarified that while he had intelligently decided to waive further judicial review, he had done so as a result of his conditions of confinement. *See id.* The district court granted Harries leave to proceed as a party plaintiff to assert he involuntarily waived post-conviction review due to allegedly inhumane prison conditions.[65] *See id.* The court also permitted the presentation of evidence regarding the conditions of confinement on Tennessee's death row for the purpose of determining whether those conditions rendered Harries's waiver involuntary. *See id.* The district court determined that the petitioners bore the burden of proving next-friend standing for purposes of establishing the jurisdiction of the court. *See id.* at 952, 953.

At the evidentiary hearing, the petitioners argued the court had jurisdiction because Harries suffered from a mental disease and because his conditions of confinement made his waiver of post-conviction remedies involuntary. *See id.* at 952. The court found that a preponderance of the evidence supported that Harries suffered from a serious mental disease, disorder or defect (bipolar disorder). It also found that Harries's condi-

tion of correctness and concluded that O'Rourke had been incompetent at the time of the waiver for purposes of assessing whether O'Rourke's waiver constituted cause to excuse procedural default of claims as a consequence of his waiver. The Eighth Circuit reversed the district court finding that even if O'Rourke was incompetent at the time of waiver and his incompetence constituted cause, he had failed to establish prejudice, and therefore, was not entitled to federal habeas relief. *See id.*

**65.** The district court bifurcated the death row conditions issue from petitioners' habeas claims and certified a class of condemned inmates regarding the death row conditions allegations. *See Groseclose v. Dutton*, 788 F.2d 356, 358 (6th Cir.1986). The district court permitted Harries to join the death row

conditions action as a plaintiff and declined to consolidate the condemned inmates' class action with an on-going class action brought by Tennessee inmates regarding the conditions of confinement generally in Tennessee prisons, *Grubbs v. Bradley*, 552 F.Supp. 1052 (M.D.Tenn.1982). *See id.; see also Groseclose v. Dutton*, 829 F.2d 581, 583 (6th Cir.1987). The district court subsequently found the conditions of confinement on Tennessee's death row unconstitutional. *See Groseclose v. Dutton*, 609 F.Supp. 1432 (M.D.Tenn.1985). The Sixth Circuit vacated the judgment holding that the district court erred by not consolidating the condemned inmates' conditions action with *Grubbs* and by applying the incorrect legal standard to find the death row conditions unconstitutional. *See Groseclose*, 829 F.2d at 585.

tions of confinement had rendered his waiver of state (and federal) post-conviction remedies involuntary. The court analogized the waiver decision to a decision to plead guilty, which had to be voluntary, *i.e.*, not the product of force, threat or improper inducement, so as to comport with due process. *See id.* at 956–57. To evaluate Harries's conditions of confinement, the court considered whether, under the totality of the circumstances, Harries's waiver was the "product of a rational intellect and unconstrained will" and not the result of "an overborn will or the product of an impaired self-determination brought on by the exertion of any improper influences." *Id.* at 957. The court found that the petitioners had proven that Harries's "failure to join in the next friend petition and seek post-conviction relief was the result of [his] coercive

conditions of his confinement," [66] that those conditions had been so adverse that they rendered his decision to waive involuntary, and that petitioners had "established that the next friend petition filed on behalf of Mr. Harries [was] needed to protect [Harries] due process interests [against an involuntary waiver]." *Id.* at 958, 961.

### B. Smith ex rel. Smith v. Armontrout

In *Smith ex rel. Smith v. Armontrout*, 632 F.Supp. 503, 506 (W.D.Mo.1986), the district court, following an evidentiary hearing, found that condemned inmate Gerald Smith was competent to decide "to abandon all further attacks on his conviction and death sentence" and dismissed the action, which had been initiated by the inmate's brother, Eugene, for lack of standing.[67] In finding Smith competent,

---

**66.** The evidence of adverse conditions in Harries's unit was uncontradicted by the respondents. *See id.* at 958. That evidence demonstrated that cells in the unit measured forty-four or thirty-five square feet (Harries had a forty-four square foot cell); death row inmates were confined to their cells for twenty-three hours a day; exercise was limited to forty-five minutes during clement weather in a small area without recreational equipment except weights; no windows in the cells and poor ventilation which failed to vent humidity (and sewage odors) from the showers to the outside and resulted in rivulets of condensation running down cell walls to the floor and the growth of fungus on the walls; only one sixty watt bulb for light; an average temperature of 80˚to 85˚Fahrenheit; no religious or psychological programming; and the provision of cold meals. *Id.* at 959–61.

**67.** The district court determined that the State bore the burden of persuasion and "endeavored to resolve all doubts in favor of finding Smith incompetent." *Id.* at 515, n. 34. Smith had previously filed a motion to dismiss his state post-conviction proceeding, which was granted without hearing on Smith's competency. The Missouri Supreme Court held a hearing at which Smith was summoned to appear. At the hearing, Smith informed the judges that he wished to aban-

don further appeals. The Missouri Supreme Court granted his wish and set his execution. Smith's brother, Eugene, filed a next-friend petition for writ of federal habeas corpus and the district court found a legitimate issue regarding Smith's competency to abandon his post-conviction proceeding and stayed his execution pending that determination. Smith decided that he wanted to pursue his state post-conviction proceedings, so the district court dismissed his federal habeas action so that Smith could exhaust his claims. In the meantime, Smith again announced that he wanted to abandon all further attacks on his conviction and sentence. The Missouri Supreme Court again set an execution date. Eugene filed a next friend petition in state court, which the Missouri Supreme Court subsequently ruled was a "legal nullity" because the state court had determined that Smith was competent approximately a year and half before. Eugene then filed a second next-friend petition in federal court arguing his brother was not competent to decide whether to abandon further litigation. The district court stayed Smith's execution and held an evidentiary hearing to assess whether Smith was then competent to abandon all further attacks on his conviction and sentence. *See generally, Smith*, 632 F.Supp. at 505–507.

the district court also addressed whether Smith's decision was voluntary in light of his conditions of confinement on Missouri's death row. *See id.* at 515. The court found that it was voluntary despite "considerable evidence showing that life on [Missouri's] death row is dismal." *Id.* The court based its determination on Smith's adherence to his decision to abandon his appeals even after he was transferred to a unit with "much better conditions" than death row, and on the opinions of two experts who concluded that it was the fact of confinement, rather than Smith's conditions of confinement, that prompted him to forego further litigation rather than seek a new trial where, at best, he would be sentenced to life imprisonment.[68] *Id.* The district court thus found that, "while the deplorable conditions on death row undoubtedly ... had some effect on Smith, they [did] not render his decision to abandon his appeals involuntary." *Id.*

The Eighth Circuit affirmed.[69] *Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.1987). On appeal, the Eighth Circuit identified two questions at issue:

first, whether [the defendant] had the capacity to appreciate his position and make a rational decision, or was suffer-

ing from a mental disease, disorder, or defect that substantially affected his capacity, *see Rees v. Peyton*, 384 U.S. at 314 [86 S.Ct. at 1506], ... and second, *whether the conditions of his confinement rendered his decision involuntary.* See *Johnson v. Zerbst*, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938).

*Smith*, 812 F.2d at 1053 (emphasis added). With respect to the voluntariness question, the Eighth Circuit observed that:

The record, particularly the testimony of Dr. Foster, Tr. 2:124–26, supports the District Court's conclusion that conditions on SMU [the unit to which Smith was transferred with much better conditions than death row] were not coercive. We think that the District Court was justified in concluding that, even if death row's conditions were in violation of the Eighth Amendment, the fact that Smith continued to adhere to his decision over the months between his transfer to SMU and the District Court hearing negated any inference of coercion.

The petitioners make much of Smith's recent letter to this Court, in which he asserts that, notwithstanding his District Court testimony, the conditions of his

---

**68.** The court endorsed the view that Smith found physical confinement intolerable "under any circumstances." *Id.* at 515.

**69.** During the pendency of the appeal, Eugene asked to be relieved of his duties as next friend and the public defender was appointed in his stead. 812 F.2d at 1052 n. 1. In addition, by the time of its decision, Smith had again changed his mind and notified the Eighth Circuit that he wanted to prosecute his habeas petition. Notwithstanding Smith's change of heart, the Eighth Circuit determined that the appeal was not moot. It noted that:

notwithstanding Smith's new stance, the controversy over his competency remains live, in that, were it accepted that he is incompetent, the petitioners would be prejudiced if they were deprived of the opportu-

nity to vindicate their position in this Court. Incompetence could cause Smith to prosecute his case in a manner that would actually subvert his claims. Indeed, it is conceivable that Smith's recent statements were a ploy through which Smith, seeking to effectuate an incompetent decision to forego postconviction proceedings, hoped to ensure that this case was dismissed.

In any case, it is also our view that Smith's past inconstancy on this question indicates that it is likely that Smith will change his mind yet again and resume his opposition to post-conviction proceedings. Consequently, we conclude that Smith's frequent about faces bring this case within the "capable of repetition, yet evading review" exception to the mootness doctrine.

812 F.2d at 1056.

confinement did affect his decision. However, this letter obviously was not before the District Court, nor is it properly part of the record here; the statements in it were not made under oath, nor have they been subjected to cross-examination. Moreover, we are not convinced that Smith's letter alters matters; the evidence concerning the actual conditions that obtain in the SMU remains unchanged, and the District Court found them not coercive. We therefore affirm the District Court's conclusion that Smith's decision was voluntary.

812 F.2d at 1058–59.

### C. Wilson v. Lane

In *Wilson v. Lane*, third parties filed a federal habeas petition on behalf of Illinois death row inmate Charles Walker as individuals and next friends.[70] *Wilson v. Lane*, 697 F.Supp. 1489, 1500 (S.D.Ill. 1988); *aff'd* 870 F.2d 1250 (7th Cir.1989). The district court determined the petitioners lacked individual (*jus tertii*) or citizen standing to bring a habeas petition on Walker's behalf. *See Wilson*, 697 F.Supp. at 1492, 1494–97.

With respect to next-friend standing, the petitioners alleged that Walker's conditions of confinement on death row had " 'impeded and violated [his] ability to freely and voluntarily exercise his constitutional rights, including his right to pursue

state post-conviction and federal habeas corpus remedies.' " *Id.* (quoting next-friend petition at ¶ 11, pp. 6–7). Citing the standard to determine "capacity" set forth in *Rees*, the district court found that:

> the sole determination is whether Walker has the capacity to make a rational choice in his decision to forego further review of his sentence, [because i]f his capacity is challenged, it must be, under the terms of *Rees*, challenged by a showing that Walker suffers from a "mental disease, disorder or defect." Following the analysis of *Rees*, this Court will discuss the issue in terms of Walker's "capacity," although other courts have used the term "competency" in their reviews.

697 F.Supp. at 1498.

The district court held that Walker's lack of capacity or competency was a requisite for petitioners to establish next-friend standing. *See id.* It determined that to the extent that the conditions of confinement/voluntariness inquiry in *Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.1987), was a part of the capacity question, it fell within the standard articulated in *Rees*: "That is, was the defendant's decision to abandon further review made voluntarily, [because] the threshold for standing as next-friends is a successful attack on the capacity to make a voluntary decision." 697 F.Supp. at 1499. The court

---

**70.** Walker pleaded guilty to two counts of murder and one count of armed robbery. He asked for a jury sentencing, which he received, and was sentenced to death. *Wilson*, 697 F.Supp. at 1491. Walker sought leave to terminate all further review following the affirmance of his convictions and sentences by the Illinois Supreme Court and opposed the filing of a certiorari petition in the United States Supreme Court. *See id.* After certiorari was denied, the Illinois Supreme Court remanded the case to the trial court to determine whether Walker (1) was " 'mentally competent to waive further legal actions;' " (2) had "made a knowing and intelligent

waiver of any such further legal actions;" and (3) was "fit to be executed." *Wilson*, 870 F.2d at 1252. The lower court found Walker competent to waive further appeals following a hearing; however, the Illinois Supreme Court directed the lower court to hold another hearing on Walker's mental condition because court-appointed counsel at the first hearing had not opposed the state's position that Walker was competent and fit for execution. *See id.* Following a second hearing, the lower court again found Walker competent and fit for execution. *See id.* The Illinois Supreme Court affirmed. *See id.*

determined that Walker's conditions of confinement was not before it, rather its inquiry was "directed only to Walker's mental state, not the specific cause thereof." *Id.* Further, the court noted that the petitioners had conceded the question of Walker's competency to the extent that they had not asserted that he suffered from a mental disease or defect. *Id.* Instead, the petitioners "limit[ed] their argument to the claim that Walker's decision to abandon his rights to further review demonstrate[d] a flawed mental state resulting from an 'overborne will.'" *Id.* The court determined that, "[t]he issue of flawed mental state or overborne will is properly addressed under the capacity test set forth in *Rees.*" *Id.* Therefore, the court limited its inquiry to "whether Walker suffers from an overborne will which substantially affects his capacity, thereby rendering his decision to abandon further relief involuntary." [71] *Id.* at 1500.

At the subsequent evidentiary hearing, the petitioners argued that Walker's conditions of confinement on Illinois' death row "coupled with the chronic effects of Walker's alcoholism," had caused Walker to involuntarily waive further legal efforts on his behalf. *Wilson,* 870 F.2d at 1252. Finding that the petitioners bore the burden of proof, *Wilson,* 697 F.Supp. at 1502, the district court found that Walker's will had not been overborne by his conditions of confinement and concluded that his "waiver of the right to further review was made freely and rationally" and that "[u]nder the totality of the circumstances, [his] decision [was] the product of both rational intellect and unconstrained will." *Id.* at 1504. Further, the court found that "Walker [had] the capacity to knowingly

waive his right to further review of his death sentence, and the same [was] done voluntarily," and dismissed the petition for lack of next-friend standing of the petitioners. *Id.*

On appeal, the petitioners argued that by limiting the scope of its inquiry to whether Walker lacked the capacity to voluntarily waive his constitutional right to post-conviction review of his guilty plea and sentence, the district court failed to recognize that mental competency or capacity were issues separate and distinct from the issue of voluntariness. *Wilson,* 870 F.2d at 1253. They argued that the district court's standard failed "'to account for waiver decisions that are involuntary because they are unduly influenced by improper factors when the mental competency or capacity of the individuals making those decisions is not otherwise in dispute,'" relying on *Smith,* 812 F.2d at 1053. *Id.* (quoting petitioners' briefs).

The Seventh Circuit disagreed, finding that the district court "did exactly what appellants asked it to do" by assessing whether Walker's decision to forego legal review was the result of an "overborne will." *Id.* at 1254. It further observed that the petitioner's "notion that Walker's conditions of confinement rendered his decision involuntary seem[ed] to fall within [the experts'] stated concepts of 'overborne will,'" which the district court "found properly [focused] on the voluntary nature of Walker's decision." *Id.* at 1254. In addition, neither expert had found Walker's capacity to make a voluntary waiver affected by any environmental factor and that Walker himself had not expressed any "serious concerns" about his conditions of

---

**71.** The district court held that the state court hearing failed to "address the issue of whether Walker suffered from a flawed mental state due to an overborne will." *Wilson,* 697 F.Supp. at 1500. However, it determined

other than the issue of a potentially overborne will, the state court determinations of Walker's capacity were sufficient. 697 F.Supp. at 1504.

confinement. Id. The Seventh Circuit found the district court did not clearly err by finding that Walker's decision was " 'in part based on the quality of his life due to the fact, not conditions, of confinement and the sheer lack of possibility of freedom during his lifetime.' " Id.

### D. Mr. Comer's Decision

The Court finds that Mr. Comer's decision to waive his right to habeas appeal and to accept execution is voluntary. In particular, it is the product of a rational intellect and an unconstrained will; it is not the result of an overborne will or the product of an impaired self-determination brought on by the exertion of any improper influences. See Smith, 812 F.2d at 1058–59; Groseclose v. Dutton, 594 F.Supp. at 951.

The Court finds that Mr. Comer's conditions of confinement have improved over the past six months but those changes have not prompted Mr. Comer to forego the decision he has consistently asserted and pursued acceptance of for over two years. The Court finds that though his conditions have had some effect on his decision, they have not had a substantial effect nor have they rendered his decision involuntary. See Smith, 632 F.Supp. at 506. The Court's findings are supported by the credible and reliable evidence presented at the competency hearing.

Dr. Johnson testified that she has

been unable to identify any coercion in his decision making. If anything, people have been trying to push him in the other direction. I mean, there's been a lot of encouragement for him not to make this choice. And I don't call it pressure, but there's been strong forces, you know, recommending that, and identifying that as an option for him. I have not seen anyone from the correctional side, where his attorneys, or anyone

else, have not identified that there are any other coercive forces.

(Id. at 821.) She concluded with the judgment: "I do think that this is a voluntary decision on his part."

When asked to comment on Dr. Johnson's findings, Mr. Comer testified that he believed that "[s]he got it right." (R.T. 3/27/02 at 478.) He expounded and said:

No, she said it right there. I live in a harsh conditions. Okay. I stay out of trouble, now they're getting unharsh. But I was competent to pull my appeals there and everything was voluntary.

I just—I have a hard time seeing that cell making me [do] anything. Trust me, I was in that cell with the Plexiglas, they stuck me on the death watch pod for, what, two months? No Plexiglas? Look at the cell, it's the same damn cell. I go back, I don't have a-don't have a desk and I don't have a stool. Okay. Is that bad? In your eyes is it bad? In my eyes it's not, 'cause now I have more room to run around there. I don't need a damn thing. Never—I never ate there, anyway. I'd go over and eat on my bed. Matter of fact, that thing's barked me in the—in the hip a whole lotta times when I run around there, so it's a blessing to have gone.

(Id.)

The Court finds Mr. Comer's decision to waive his right to habeas appeal and proceed with execution is voluntary and he has not been overborne by his conditions of confinement.

### CONCLUSION

The Court's own judgment that the decision to choose to accept execution is ill-conceived, and that it is unlikely that anyone would freely abandon his right to appeal a death sentence, has been brought to bear by the compelling evidence that Mr.

Comer's decision is competent and has been voluntarily made.

It is obvious that what is most important to Mr. Comer "is that he has the opportunity to choose."(R.T. 3/28/02 at 822.) He has made a competent and free choice, which "is merely an example of doing what you want to do, embodied in the word liberty." *Adkins v. Children's Hosp.*, 261 U.S. 525, 568, 43 S.Ct. 394, 67 L.Ed. 785 (1923)(Holmes, J., dissenting). He should be afforded that choice.[72]

Accordingly,

**IT IS ORDERED** finding Petitioner Robert Charles Comer competent to terminate representation by habeas counsel, subject to review on appeal, and to waive further legal review of his habeas claims.

**IT IS FURTHER ORDERED** finding Petitioner Robert Charles Comer's decisions to terminate representation by habeas counsel and to waive further legal review, subject to review on appeal, voluntary.

**IT IS FURTHER ORDERED** denying as moot Respondents' motion to reconsider the grant of use immunity. (Dkt. 401).

**IT IS FURTHER ORDERED** denying as moot habeas counsel's continuing motion to strike. (Dkt. 429).

**IT IS FURTHER ORDERED** granting the motion of habeas counsel for a copy of the ADOC master file filed by special counsel. (Dkt. 430).

**IT IS FURTHER ORDERED** denying the motion of special counsel to terminate habeas counsel pending appeal of this decision. (Dkt. 436).

**IT IS FURTHER ORDERED** entering judgment regarding the issues remanded to this Court and closing the district court's file in this matter, subject to appeal.

---

**72.** On July 23, 2002, special counsel filed the affidavit of Mr. Comer in which he avers that he has read and discussed in detail with special counsel the possible implications of *Ring v. Arizona,* —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on his sentence and appeal. (Dkt. 437.) Mr. Comer also avers that *Ring*'s potential effects on his sentence have

not altered his decision to waive further legal review. (*Id.*)

The Court is persuaded that Mr. Comer both understands the potential effects of *Ring* on his sentence and appeal and that he knowingly, intelligently and voluntarily waives any potential benefit of *Ring* on his sentence or appeal.